**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Daniel Clement JONES, Defendant–**
**Appellant.**

**No. 91–5298.**

United States Court of Appeals,
Fourth Circuit.

Argued May 5, 1992.

Decided Sept. 18, 1992.

John Kenneth Zwerling, Moffitt, Zwerling & Kemler, P.C., Alexandria, Va., argued (William B. Moffitt, Lisa B. Kemler, Alan J. Cilman, on brief), for defendant-appellant.

Jacquelyn Irwin Custer, Asst. U.S. Atty., Charleston, W.Va., argued (Michael W. Carey, U.S. Atty., on brief), for plaintiff-appellee.

Before PHILLIPS, MURNAGHAN, and NIEMEYER, Circuit Judges.

## OPINION

NIEMEYER, Circuit Judge:

A jury convicted Daniel Clement Jones for possessing, transferring, and transporting in interstate commerce two shotguns which he had modified to function as machine guns and sold to federal undercover agents, in violation of the National Firearms Act, 26 U.S.C. §§ 5801–72. Jones now challenges his conviction, contending principally that (1) he was entrapped as a

matter of law, (2) the undercover operation, constructed to "ensnare" him, was "so outrageous as to shock the conscience of the court," thereby violating his right to due process, and (3) the government's decision to charge him under the National Firearms Act and not under the Gun Control Act of 1968, 18 U.S.C. §§ 921–30, violated due process because, he contends, an amendment to the Gun Control Act rendered unenforceable the applicable provisions of the National Firearms Act. He also maintains that the district court abused its discretion during the course of trial in excluding certain evidence, in refusing to declare a mistrial on the firearms counts after it admitted evidence on a money laundering count which it then dismissed at the end of the government's case, and in failing to give certain instructions to the jury. Concluding that Jones was not denied due process and that the district court committed no reversible error, we affirm.

## I

During an undercover investigation conducted by the IRS into money laundering operations thought to involve Donald E. Kramer, a businessman from Cody, Wyoming, and Don Barton, a venture capitalist from Dallas, Texas, Kramer referred the IRS to the defendant, Daniel Jones, as one who might launder money and supply illegal weapons. Jones was a mechanical engineer living in Texas who was seeking venture capital to market two inventions. After referring the IRS to Jones, Kramer contacted Jones, informing him that Kerry Anthony, an undercover informant for the government, had money to invest and was also interested in obtaining weapons. Jones and Anthony thereafter, in several telephone conversations, discussed investments and weapons, and more particularly Jones' design to convert shotguns into machine guns and his willingness to manufacture such conversion kits.

On July 19, 1990, Jones flew from Texas to Parkersburg, West Virginia, to meet Anthony and Richard Kemp, an undercover agent of the Bureau of Alcohol, Tobacco and Firearms, and to demonstrate his conversion design. In a hotel room there, he altered the trigger assembly of a semiautomatic shotgun using small pieces of metal, while he explained that the modification would render the shotgun fully automatic and could not be detected without removing the trigger assembly or firing the weapon. The three then went to a firing range to test the weapon, which twice fired two shells with one pull of the trigger, then returned to firing only single shots with each trigger pull. Jones diagnosed the malfunction, concluding that a stronger spring was probably required.

On July 26, Anthony received a UPS package containing a trigger assembly that, when substituted for the original, allowed Kemp to fire a semi-automatic Remington shotgun continuously so long as the trigger was depressed. A few days later, Kemp called Jones to confirm receipt of the assembly from Jones and to congratulate him on his workmanship. During the course of negotiations about money that followed, Kemp requested five more converted shotguns and Jones indicated, more than once, his willingness to manufacture them. Kemp and Jones also discussed the possibility that Kemp might invest in one of Jones' companies and other prospects of future cooperation in the "long term." In a follow-up telephone conversation, Jones agreed to drive to Parkersburg a few days later with two modified shotguns and several nine-millimeter handguns.

On August 3, 1990, Jones drove to West Virginia with the two converted shotguns, four handguns, and other items. In a hotel room in Parkersburg, he met Anthony, Kemp, and local Deputy Sheriff Bruce Schuck, who was acting as an associate of Kemp's. They first discussed Jones' remuneration, agreeing to $2,000 for each of the converted shotguns, $1,000 for each of the handguns, and $12,000 for Jones' start-up costs. They also agreed that Jones would supply future lots of 20 to 30 converted shotguns at $1,400 each and 25 to 50 nine-millimeter handguns for $900 each. During these discussions, Kemp told Jones that the money was "dope money," but Jones responded, "I don't care," and, "As far as I'm concerned, you guys are working—this

is going to the Contras...." Kemp responded, "Well, that's cool. That's cool." When Anthony later said, "If you want to call them Yaqui Indians Contras, we can call 'em anything you want to," Jones answered, "I don't know nothing about any goddamn Indians.... Same thing Oliver North and Reagan have done, as far as I'm concerned." At the meeting, Jones received $50,000 in cash to pay for the arms and other merchandise and to fund the further production of weapons. As Jones left the hotel room in possession of the cash, he was arrested.

The government indicted Jones in seven counts, two counts for possessing a firearm made without the approval required by 26 U.S.C. § 5822, in violation of 26 U.S.C. § 5861(c); two counts for transferring a firearm without the approval required by 26 U.S.C. § 5812(a), in violation of 26 U.S.C. § 5861(e); two counts for transporting a firearm which was not registered as required by 26 U.S.C. § 5841, in violation of 26 U.S.C. § 5861(j); and one count for money laundering in violation of 18 U.S.C. § 1956(a)(3). After the government presented its case at trial, the district court directed a verdict of acquittal on the money laundering count. Jones was convicted of the other counts and sentenced to 15 months imprisonment.

At trial, Jones did not deny that he manufactured, transported and transferred the modified shotguns without the requisite authorizations and registrations but presented evidence to support his argument that he had been entrapped and that he thought he was dealing with government agents seeking to acquire automatic weapons. He also requested a mistrial on the ground that the admission of evidence about drugs and money, pertinent to the dismissed charge of money laundering, unduly prejudiced his defense on the weapons charges. From adverse rulings on these points and on other rulings on evidence and jury instructions, this appeal followed.

## II

Jones' principal defense at trial and principal point on appeal is that he was entrapped as a matter of law. Contending that his knowledge that his conduct was criminal is essential to the government's effort to rebut an entrapment defense, Jones asserts that he did not know that the conduct was criminal because he thought he was supplying the converted shotguns to government agents for use by the Contras in Nicaragua. He also contends that his decision to commit the crime was the product of undue governmental persuasion because of the large amounts of money it was offering at a time when he was in need of money. The district court submitted the defense to the jury, and the jury returned a guilty verdict. Jones argues that he should nevertheless be entitled to the benefit of the entrapment defense as a matter of law.

■ The affirmative defense of entrapment recognizes that the government may solicit or otherwise provide the opportunity to commit a crime for those predisposed to do so but may not "implant in an innocent person's mind the disposition to commit a criminal act, and then induce commission of the crime so that the Government may prosecute." *Jacobson v. United States*, — U.S. —, —, 112 S.Ct. 1535, 1540, 118 L.Ed.2d 147 (1992); *see also United States v. Osborne*, 935 F.2d 32, 37–38 (4th Cir.1991). Once a defendant meets his initial burden of presenting evidence that the government induced him to commit the crime, *Osborne*, 935 F.2d at 38; *United States v. Akinseye*, 802 F.2d 740, 743 (4th Cir.1986), *cert. denied*, 482 U.S. 916, 107 S.Ct. 3190, 96 L.Ed.2d 678 (1987), the government has the burden of proving "beyond reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by Government agents." *Jacobson*, — U.S. at —, 112 S.Ct. at 1540; *see Osborne*, 935 F.2d at 38.

■ The government may meet its burden by demonstrating the defendant's ready response to the inducement offered. *See Jacobson*, — U.S. at —, 112 S.Ct. at 1541; *Osborne*, 935 F.2d at 38. While such a response after lengthy efforts by the government to induce the commission of a

crime is not sufficient, *Jacobson,* — U.S. at — , 112 S.Ct. at 1543, it is sufficient to show that " 'the defendant is of a frame of mind such that, once his attention is called to the criminal opportunity, his decision to commit the crime is the product of his own preference and not the product of government persuasion.' " *Osborne,* 935 F.2d at 38 (quoting *Akinseye,* 802 F.2d at 744).

■ Finally, if, as in this case, the issue of entrapment is submitted to the jury, the jury's finding of guilt comprehends a finding of no entrapment. Consequently, an appellate court may overturn this determination only if no rational trier of fact could have found predisposition beyond a reasonable doubt, viewing the evidence in the light most favorable to the prosecution. *Akinseye,* 802 F.2d at 744.

■ Jones contends that he did not know that his conduct was illegal because he thought the machine guns were being purchased under federal authority for the Contras in Nicaragua. His argument is based principally on a dialogue that took place on August 3, 1990, during a tape-recorded meeting he had with Anthony, the paid informant; Kemp, the undercover agent; and Schuck, the local sheriff acting as Kemp's associate. Kemp told Jones that the purchase money for the guns was "dope money," to which Jones replied, "I don't care." The conversation continued:

Mr. Kemp: And we don't care about—I know you don't care, and I don't either.

Mr. Jones: As far as I'm concerned, you guys are working—this is going to the Contras, and that's what I believe.

Mr. Kemp: Well, that's cool. That's cool.

Mr. Jones: Unintelligible—Contra aid.

Mr. Kemp: Okay.

While that conversation, and others similar to it, refer to the use by the Contras of the weapons to be supplied by Jones, the jury could well have concluded that Jones was adopting a posture to rationalize his involvement or developing a cover to use if he were caught. This interpretation is corroborated by other evidence of illegal conduct and intent.

The government offered evidence from which the jury could have concluded that Jones was advised only that Anthony and Kemp were international drug dealers. Indeed, the evidence indicates that Kramer told Jones in their initial discussion that Anthony was a "shady customer . . . on the wrong side of the law." Jones' recognition of illegality is supported by the manner in which he developed and demonstrated the shotgun conversion. When Jones first demonstrated his conversion of a shotgun to a machine gun, he pulled out parts concealed in fishing gear, in his billfold, and in other locations, and he pointed out how the modification could not easily be detected. Moreover, Jones was advised repeatedly, by direct statement and by suggestions, that the money he was to receive was drug money. In short, the evidence is ample to permit a jury to conclude, beyond a reasonable doubt, that Jones was aware of the fact that his conduct was criminal.

More importantly, however, Jones' premise that the government was required, in rebutting the entrapment defense, to show that Jones knew his conduct to be criminal is incorrect. The core issue raised by the entrapment defense is whether the defendant was predisposed to conduct which is criminal, regardless of whether the defendant appreciated its criminality, and to prove predisposition the government need not prove that the defendant knowingly committed the crime. *See Jacobson,* — U.S. at — n. 3, 112 S.Ct. at 1542 n. 3.

Jones also contends that the evidence was insufficient to show that he was predisposed to commit the crime. He argues that he had no prior criminal record and that his primary interest was to obtain venture capital for the purpose of marketing his inventions. He points to the evidence of the on-going negotiations between him and Anthony for a $1.5 million investment. A reading of the record confirms Jones' contention that he expressed interest in a substantial sum to be invested in his business, and even possibly that his conduct was motivated by the prospect of receiving the investment. But the record just as well supports a finding that Jones was also willing to convert shotguns to

machine guns for a fee without obtaining the required authorizations.

The first time that Jones learned about Anthony's interest in weapons—when Kramer passed on Anthony's general queries—Jones told Kramer that he wanted to show Anthony a machine gun design he had and shortly thereafter he discussed the design and investments with Anthony during several telephone calls while Anthony was in Atlanta. On July 2, Jones agreed to "do a dry run," resulting in the malfunctioning sample conversion kit he delivered in person on July 19 and the fully functioning conversion kit he sent by mail on July 26, all before obtaining the needed governmental approval. More importantly, all of this took place *before* he had agreed on the financial terms of the deal, which Jones hoped would include an investment in his business. And, once the basic agreement was reached on the financial terms on July 30, Jones willingly delivered the two modified shotguns, giving rise to the offenses charged in this case. On August 3, Jones also negotiated quantities and prices for future large weapons shipments. No reluctance on Jones' part was shown when pursuing any of these activities.

Jones points to his refusals to accept $50,000 from Anthony and Kemp, instead of the charged price of $12,000, and he argues that an intimidating call from Anthony to Kramer on July 30, relayed to Jones, caused him to go through with the deal. Kramer, who cooperated with the government under a plea agreement after Jones' arrest, did testify without contradiction that he felt intimidated by a call from Anthony on July 30 and communicated his feeling to Jones. Yet Jones himself made light of Kramer's reaction during his own conversation with Anthony later that same day, and there was no evidence of intimidation by Anthony or anyone else directed at Jones himself. More pertinently, however, throughout the discussions in July, Jones expressed his reluctance to establish financial relations which might entangle him ineluctably with Anthony and Kemp, while nonetheless agreeing on July 2 to do a "dry run" and then delivering the two conversion kits on July 19 and 26.

Jones never suggested that he was unwilling to supply Anthony and Kemp with the weapons they sought.

The evidence amply supports finding that Jones initially responded positively to the invitation to commit the crime, consistently pursued the plan during further contacts with the government, and ultimately committed the offenses of which he was charged. When considered in a light most favorable to the government, the evidence is sufficient for a rational juror to find predisposition beyond a reasonable doubt. *See Akinseye*, 802 F.2d at 744.

### III

In addition to the statutory defense of entrapment, Jones claims that the government's conduct of the undercover operation was "so outrageous as to shock the conscience of the court" and consequently violated his Fifth Amendment right to due process. *See United States v. Russell*, 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1642–43, 36 L.Ed.2d 366 (1973) (contemplating the possibility that sufficiently outrageous governmental conduct might preclude conviction, but rejecting it on the facts); *Osborne*, 935 F.2d at 36 (same). He complains that the government allowed Anthony, an untrained confidential informant whose only source of income was his investigative activities for the government, to "ensnare" Jones in a series of unmonitored and unrecorded conversations and that it pursued him despite his hesitations, ultimately resorting to intimidation · when offers of "obscene" sums of money proved inadequate. This complaint has little support.

In *United States v. Hunt*, 749 F.2d 1078, 1087 (4th Cir.1984), *cert. denied*, 472 U.S. 1018, 105 S.Ct. 3479, 87 L.Ed.2d 614 (1985), we rejected a claim that an undercover investigation of a state judge concerning judicial corruption was "outrageous," even though government agents posing as criminals seeking corrupt judicial protection pursued the judge despite his initial hesitations and "leaned on" an intermediary to convince the judge to help them. We think the facts of this case press the issue no fur-

ther. As already discussed above, the evidence reveals that Jones did not hesitate to provide automatic shotguns, but merely held out for advantageous financial arrangements. *Cf. Hunt,* 749 F.2d at 1087 ("seeming lack of interest in money ... could reasonably be construed as mere negotiating tactics"). Nor was he directly intimidated by government agents; and, in light of Jones' negotiating position and the role of international drug dealers being portrayed by Anthony and Kemp, it was reasonable for Anthony to push the intermediary, Kramer, during the conversation on July 30. *Cf. Hunt,* 749 F.2d at 1088 ("FBI agents ... had to make their undercover roles convincing to their unwitting middleman").

Although in *Hunt* we noted that the government had targeted the judge after receiving investigatorial leads pointing to judicial corruption, *Hunt,* 749 F.2d at 1087, we recently rejected the proposition that the government may not conduct an undercover investigation without reasonable cause to suspect criminal wrongdoing. *Osborne,* 935 F.2d at 35–36; *see also United States v. Steinhorn,* 739 F.Supp. 268, 272 (D.Md.1990). *But cf. United States v. Luttrell,* 889 F.2d 806, 813 (9th Cir.1989) (requiring "reasoned grounds" to investigate a particular individual), *vacated in part,* 923 F.2d 764 (9th Cir.1991) (en banc) (rejecting the "reasoned grounds" requirement), *cert. denied,* — U.S. —, 112 S.Ct. 1558, 118 L.Ed.2d 207 (1992). In this case, Anthony's contacts with Kramer and Jones were authorized by the IRS as the by-product of an ongoing investigation of Donald Barton for money laundering. The suggestion that Jones as a law-abiding citizen was targeted and corrupted by governmental activity is unsupported.

### IV

Jones also contends that the government's decision to charge him with violations of the National Firearms Act, 26 U.S.C. §§ 5801–72, denied him the due process guaranteed him by the Fifth Amendment, because of a supposed conflict between that act and a 1986 amendment to the Gun Control Act of 1968, 18 U.S.C. § 922(*o*), which outlaws possession or transfer of machine guns manufactured after 1986, with certain exceptions.

There is no question that Jones' conduct in this case fell squarely within the proscriptions of the National Firearms Act: Jones modified two shotguns to fire automatically more than one shot with each pull of the trigger, rendering them machine guns and hence "firearms" subject to the taxes and ancillary regulations of the National Firearms Act. *See* 26 U.S.C. § 5845(a), (b). Since he never sought or received the written approval of the Secretary of the Treasury to make the firearms, *see* 26 U.S.C. § 5822, his knowing possession of them constituted "possess[ing] a firearm made in violation of the provisions of [the act]." 26 U.S.C. § 5861(c). Since he never registered them in the National Firearms Registration and Transfer Registry, *see* 26 U.S.C. § 5841, their transportation from Texas to West Virginia violated the proscription of "transport[ing] ... any firearm in interstate commerce which has not been registered as required by [the act]." 26 U.S.C. § 5861(j). And, since the Secretary never approved their transfer, *see* 26 U.S.C. § 5812, their sale to the undercover agents constituted "transfer[ing] a firearm in violation of the provisions of [the act]." 26 U.S.C. § 5861(e); *see* 26 U.S.C. § 5845(j) ("The term 'transfer' ... shall include selling....").

Nonetheless, Jones contends that the government should have charged him under the Firearms Owners' Protection Act of 1986, Pub.L. No. 99–308, 100 Stat. 449, which amended the Gun Control Act of 1968 to make it unlawful "for any person to transfer or possess a machinegun," not lawfully possessed before May 19 of 1986, but provided an exception for transfers to and possessions by or under the authorization of the United States. 18 U.S.C. § 922(*o*). He asserts that this effective ban on dealings with machine guns coming into existence after May of 1986 rendered it impossible for him to receive the authorizations required under the National Firearms Act. *See* 26 U.S.C. §§ 5812, 5822 (mandating denial of authorizations if pos-

session of the firearm would be illegal for the person seeking authorization). Citing *United States v. Dalton*, 960 F.2d 121 (10th Cir.1992), he concludes that, because the Firearms Owners' Protection Act made compliance with the National Firearms Act impossible, the provisions of the earlier act concerning machine guns either were implicitly repealed by the later act or cannot be enforced without constituting fundamental unfairness in violation of his Fifth Amendment right to due process. *Id.* at 126 (finding irreconcilable punishment for the failure to register a machine gun and the government's refusal to register it). Relying on another due process argument, he also contends that the National Firearms Act cannot be enforced because it has lost its constitutional basis as a taxing provision. *Id.* at 124 (holding that a provision adopted under the power to tax no longer has a constitutional basis when the subject of the provision can no longer be taxed).

We cannot agree with either argument. "In the absence of some affirmative showing of an intention to repeal, the only permissible justification for repeal by implication is when the earlier and later statutes are *irreconcilable.*" *Morton v. Mancari*, 417 U.S. 535, 550, 94 S.Ct. 2474, 2482, 41 L.Ed.2d 290 (1974) (emphasis added). Here, neither the statutory language nor the legislative history of the 1986 amendment of the Gun Control Act affirmatively expresses a congressional desire to except machine guns from the earlier established requirements of the National Firearms Act. And the two statutes are not irreconcilable because, despite Jones' assertions to the contrary, Jones *can* comply with both acts. While he may not be able to register newly-made machine guns in which he deals, neither act requires him to deal in such guns. Simply put, Jones can comply with both acts by refusing to deal in newly-made machine guns. *Cf. Minor v. United States*, 396 U.S. 87, 96–97, 90 S.Ct. 284, 288–89, 24 L.Ed.2d 283 (1969) (rejecting argument that record-keeping requirements of act taxing narcotics sales compelled self-incrimination when applied to illegal sales, because defendant need not make illegal sales). Similarly, Jones' ability to comply with both the National Firearms Act and the Gun Control Act, as amended, vitiates his argument about fundamental unfairness.

What Jones is really complaining about is that the amendment to the Gun Control Act effectively rendered possession of certain guns automatic violations of both the Gun Control Act and the National Firearms Act. Yet there is nothing either inconsistent or unconstitutionally unfair about Congress' decision to do so. And, faced with two equally applicable penal statutes, there is nothing wrong with the government's decision to prosecute under one and not the other, so long as it does not discriminate against any class of defendants, which Jones does not allege. *United States v. Batchelder*, 442 U.S. 114, 123–24, 99 S.Ct. 2198, 2203–04, 60 L.Ed.2d 755 (1979); *see also Ball v. United States*, 470 U.S. 856, 859, 105 S.Ct. 1668, 1670, 84 L.Ed.2d 740 (1985) (noting prosecutor's discretion to charge under either of two overlapping gun control statutes). Consequently, Jones' convictions cannot be reversed simply because the government charged him with his violations of the National Firearms Act and not those of the Gun Control Act.

We are also not persuaded by the alternative ground for reversal in *Dalton*, 960 F.2d at 124–25, that the effective ban of machine guns made after May 1986 "undercut the constitutional basis of registration which had been the rule since" the National Firearms Act was originally upheld under Congress' power to tax. *See Sonzinsky v. United States*, 300 U.S. 506, 513–14, 57 S.Ct. 554, 555–56, 81 L.Ed. 772 (1937). Notwithstanding the effective ban on machine guns made after 1986, the making of even illegal machine guns continues to be taxed. *See* 26 U.S.C. § 5821; *cf. Dalton*, 960 F.2d at 125 (recognizing government's assertion that it still taxes the making of illegal machine guns). The court in *Dalton* considered the collection of a making tax irrelevant to a prosecution for possession and transfer without requisite registration, if possession and transfer are not taxed. *Id.* But this is too crabbed a view of the purposes of requiring regis-

tration and authorizations for possession and transfer of firearms subject to a making tax. For, clearly, knowing the chain of possession and transfer assists in determining who made the firearm and hence is "supportable as in aid of a revenue purpose." *Sonzinsky,* 300 U.S. at 513, 57 S.Ct. at 555; *cf. United States v. Matthews,* 438 F.2d 715, 716–17 (5th Cir.1971) (upholding National Firearms Act provision criminalizing possession of an unregistered gun, despite inapplicability of a concurrent tax, because the registration requirement was designed "to aid the collection of tax on any future transfer").

Moreover, even if the National Firearms Act's proscriptions concerning machine guns were no longer supportable as within Congress' power to tax, there can be no serious contention that their application in this case to two machine guns which were transported between two states for sale exceeds Congress' power to regulate interstate commerce. *Cf. Minor,* 396 U.S. at 98 n. 13, 90 S.Ct. at 289 n. 13 (noting that registration regulations amounting to a ban on certain sales could be upheld under Commerce Clause, even if not within power to tax).

### V

Jones's other contentions merit only brief discussion.

■ He objects to the district court's refusal to instruct the jury to find Jones not guilty if it finds that he made and sold the machine guns only for and to the United States or believed that he sold the guns to government agents. Although the National Firearms Act does exempt from its taxes both firearms businesses conducted exclusively with the United States, 26 U.S.C. § 5851(a), and the making for and transfer to the United States of any firearms, 26 U.S.C. § 5852(a), (b), neither exemption purports to relieve those exempted from the taxes from the regulatory requirements adopted to aid in the enforcement of these taxes against otherwise covered individuals and transactions. Moreover, both exemptions explicitly require the Secretary's approval after written applica-

tion for exemption, which Jones never sought. *See* 26 U.S.C. §§ 5851(b), 5852(f); 27 C.F.R. § 179.90; *see also United States v. Gillis,* 474 F.2d 4, 5–6 (9th Cir.1973) (per curiam) (rejecting exemption defense to prosecution for transfer to undercover federal agent of unregistered machine gun without payment of required tax, because of defendant's failure to follow required procedures). In light of our conclusion that Jones was properly charged under the National Firearms Act and not under 18 U.S.C. § 922(*o* ), the lack of the evidentiary foundation for these instructions rendered the district court's refusal to give them entirely correct. *Cf. United States v. Hicks,* 748 F.2d 854, 857 (4th Cir.1984) (reversing because of refusal to give instruction of a defense "for which there is a foundation in the evidence"). Similarly unsupported by the evidence was Jones' proposed jury instruction No. 32, requiring acquittal if the jury found Kramer to have "persuaded, improperly enticed or talked" Jones into committing the crimes. And the instruction, to which Jones objected, about the possibility that Kramer functioned occasionally as an agent of the government, was more than adequate.

■ Jones also complains that the district court refused to allow him to question Rev. Cleon Flanagan, one of Jones' former business partners, about an incident when Jones turned down an offered investment because Jones had been told, in Flanagan's presence, that the money was illicit. Exclusion of this testimony on the ground that it was hearsay about whether the money was illicit may well have been erroneous, since it was not offered to show that the money was illicit but only to show that Jones turned down what appeared to be illicit, although the testimony's admissibility on relevancy grounds is, at least, highly questionable. In any case, any error was harmless since the evidence was offered only to rebut the attenuated inference arising from the prosecution's contextual evidence that Jones was willing to deal with people he knew to be drug dealers, leaving us confident that " 'the judgment was not substantially swayed by the error.' "

*United States v. Nyman,* 649 F.2d 208, 211–12 (4th Cir.1980) (quoting *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946)).

■ Finally, Jones contends that the district court should have declared a mistrial because of the admission of evidence of the discussions concerning drugs and investments, originally relevant to the money laundering charge, which was not submitted to the jury. Since the discussions of drugs and investments were so closely intertwined with those concerning the illegal shotguns and were arguably admissible "to complete the story of the crime on trial by proving its immediate context," *United States v. Masters,* 622 F.2d 83, 86 (4th Cir.1980) (quotation omitted), we cannot consider the district court's refusal to declare a mistrial an abuse of discretion. *See United States v. Brooks,* 957 F.2d 1138, 1143 (4th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 3051, 120 L.Ed.2d 917 (1992).

## VI

In summary, we conclude that the evidence amply supports the jury's finding beyond a reasonable doubt that Jones was predisposed to possess, transport and transfer illegal machine guns without obtaining prior governmental approval, and neither the government's conduct of the undercover operation nor its decision to charge Jones under the National Firearms Act rather than the Gun Control Act violated Jones' right to due process. We also conclude that none of Jones' procedural objections to the trial merit reversal. Accordingly, Jones' convictions are affirmed.

AFFIRMED.