**UNITED STATES of America**

v.

**Thomas A. PRYTZ.**

**Crim. No. 2:92–593.**

United States District Court, D. South Carolina, Charleston Division.

May 27, 1993.

Joseph P. Griffith, Jr., Charleston, SC, for plaintiff.

Gordon H. Garrett, Charleston, SC, for defendant.

## ORDER

NORTON, District Judge.

This matter is before the court upon defendant's motions to dismiss and quash the indictment, and upon defendant's motion to suppress evidence.

## I. INDICTMENT

Defendant, Thomas A. Prytz (hereinafter "Prytz" or "defendant"), was indicted for violating 18 U.S.C. § 2252(a)(2) & (b). The indictment states:

That on or about February 27, 1992, in the District of South Carolina, the Defendant, THOMAS A. PRYTZ, knowingly received one video tape containing seven separate films which had been transported and shipped in commerce, said video tape containing visual depictions of minors engaged in sexually explicit conduct, the production of said visual depictions having involved the use of minors engaged in sexually explicit conduct.

Indictment, p. 1 (Count 1).

## II. BACKGROUND

The parties have stipulated to and agreed on the basic facts leading up to defendant's indictment. Specifically, the parties have stipulated to and agreed on the factual accuracy of the government's investigative case report summary (hereinafter "government's report") prepared by United States Postal Inspector James Charlton (hereinafter "Inspector Charlton"). The defendant has submitted his own factual statement as a supplement to the government's report.[1] The following factual background is excerpted from the government's report.[2]

### DETAILS OF OFFENSE

U.S. Customs seized an incoming foreign piece of mail on about June 13, 1988 addressed to T.A. Prytz containing child pornography. The status of this seizure is unknown.[3]

U.S. Customs seized another incoming foreign piece of mail on about October 7, 1991 addressed to Thomas A. Prytz [address deleted] containing a video tape depicting bestiality or humans engaged in sexual activity with animals.

[Information concerning Prytz's change of address deleted.]

On August 1, 1991, the South Carolina Law Enforcement Division and Postal Inspectors arrested Mark Stephen Fortier for dissemination of obscene matter by mail. A search of his business was conducted and review of his customer records disclosed some customers were interested in obtaining child pornography. The in-

---

1. At the hearing, the government objected to anything in this supplemental statement that might conflict with its report.

2. In order to protect the defendant's privacy, his mailing address and other personal information have been deleted from the government's factual background.

3. Although Prytz does not deny the accuracy of the government's report, he contends in his supplemental statement of facts that he never ordered child pornography tapes prior to the events giving rise to his indictment in 1992. Defendant's Supplemental Statement of Facts, p. 1 & 4.

vestigation of Fortier disclosed he had advertised in several 'swinger' publications which cater to those interested in sexually explicit conduct and sexually explicit materials. One of his ads read, 'Videos, amateur, high-quality, made by swingers for swingers, all interests, over 350 titles. Send long SASE for free brochure to: M & D, POB 1226, Lancaster, SC 29721.'[4] Subsequent to the arrest of Fortier, [Inspector Charlton] took over his post office box in order to correspond with individuals writing him regarding sexually explicit video tapes.

[Inspector Charlton] received a letter postmarked January 25, 1992 at Charleston, SC addressed to M & D at the Lancaster, SC Post Office and bearing the return address of Thomas A. Prytz [address deleted].[5] This letter simply contained Prytz's self-addressed envelope and a postage stamp.

On January 31, 1992, [Inspector Charlton] mailed an undercover letter to Prytz in his self-addressed stamped envelope. This two page letter purported to be from a company selling sexually explicit video tapes. The second page of this letter contained over 100 general categories or types of tapes for sale and gave the recipient the opportunity to choose five categories he wished to receive more information about. The recipient was advised to circle the five categories he was most interested in and return the form to [Inspector Charlton] for more information. This form also gave the recipient the opportunity to advise he did not want this type material and to ask that his name be removed from [Inspector Charlton's] mailing list. The form also contained the following statement for the recipient to sign if he wanted more material:

I swear I am an adult over the age of 21 and that all information requested is for my own personal use and not for resale. I understand these materials contain graphic sexual material and I do not object to such sexual material. I further swear I am not a police officer or postal inspector....

[Inspector Charlton] received a letter in the mail postmarked February 5, 1992 at Charleston, SC. This letter contained the second page of [Inspector Charlton's] above letter which had been completed with the name and address of Thomas A. Prytz [address deleted]. Prytz had circled the sexual categories 'animal, bull, dogs, incest and K–9 oldies.' He also wrote on the form that he was interested in materials depicting enemas and fisting.

[Inspector Charlton knew] from ... experience investigating pornography cases that the terms 'animal, bull, dogs and K–9 oldies['] refer to bestiality. [Inspector Charlton] further knew the term incest often refers to child pornography.

On February 26, 1992, [Inspector Charlton] mailed a letter to Thomas A. Prytz in North Charleston from [his] undercover operation. This letter contained an order form, an offer to trade video tapes and video catalogs for the categories 'GS and pissing tapes, incest tapes, farmyard friends videos and adult tapes.'

One tape on the 'GS and pissing tapes' catalog was described as follows:

GS tape No. 35—NO. CVU–GS5—this tape is about 2 hours of various clips—$45 from lots of movies—all with pissing and sex.

Three tapes on the 'Farmyard Friends Video' catalog were described as follows:

Animal Lovers—Woman in sex with dogs, pig, horse. Famous horse scene! No. CVU–FFV2—$30

The Horny Dog—Three women having sex with a dog. No. CVU–FFV4—$30

Bull Orgy—Woman having sex with large bull. No. CVU–FFV5—$30

Seven video tapes listed on the 'Incest Video Tapes' catalog were described as follows:

---

4. This M & D ad appeared in the magazine, Carolina Express. Carolina Express is not a government sponsored entity.

5. Defendant responded to the M & D ad, which was placed by M & D (and Fortier) prior to the government's involvement with M & D.

[The titles of these video tapes were: (1) Schoolboys Sex Orgie; (2) Masturbating Lolita; (3) Lolita Mother and Daughters; (4) Lolita Mother and One Daughter; (5) Lolita Girls and Boy; (6) Teaching Lolita Sex; and (7) Lolita Love Child. Each title had a detailed and graphic description of the contents of the video. The videos depicted sexual activities of children ranging from ages 6 to 16. Inspector Charlton and defendant's attorney agreed at the hearing before this court, that these descriptions accurately described the contents of the videos.]

[Inspector Charlton] received a letter at [his] undercover operation postmarked February 10, 1992 at Charleston, SC and bearing the return address of Thomas A. Prytz [address deleted]. This letter contained the above order form which had been completed with the name and address of Thomas A. Prytz. . . . The order form was completed to show his order of eleven video tapes from the GS and Pissing catalog, Farmyard Friends catalog and Incest Video [catalog] sent to him previously. Mr. Prytz ordered the following tapes: 'No. 35 . . ., Animal Lovers . . ., The Horny Dog . . ., Bull Orgy . . ., Schoolboys Sex Orgy . . ., Masturbating Lolita . . ., Lolita Mother and Daughters . . ., Lolita Mother and One Daughter . . ., Lolita Girls and Boy . . ., Teaching Lolita Sex . . . and Lolita Love Child. . . .' Also included with the order form for these eleven tapes was a personal check on the personal account of Thomas A. Prytz dated February 7, 1992, in the amount of $390.00 and payable to [Inspector Charlton's] undercover company. This check bore the name and address of Thomas A. Prytz [address deleted].

Based upon all of the above correspondence with Thomas A. Prytz and his order for eleven video tapes depicting sexual activity involving urination, sexual activity between humans and animals and child pornography, three video tapes depicting minors under the age of 18 engaged in sexually explicit conduct were prepared from previously seized materials. One tape was labeled 'GS tape No. 35. . . .' The second tape was labeled 'Animal Lov-

ers . . ., The Horny Dog . . . and Bull Orgy. . . .' The third tape was labeled 'Schoolboys Sex . . ., Masturbating Lolita . . ., Lolita Mother/Daughters . . ., Lolita Mother/Daughter . . ., Lolita Girls/Boys . . ., Teaching Sex . . . and Love Child. . . .'

[Inspector Charlton] verified through the Postal Service that Thomas A. Prytz receives mail at [address deleted].

The above three video tapes prepared in response to Thomas A. Prytz's order were placed in a mailing container addressed to Thomas A. Prytz [address deleted].

On February 27, 1992, the above package containing the video tapes prepared in response to Prytz's order was delivered by United States mail to Thomas A. Prytz [address deleted].

Subsequent to the delivery of the video tape to Mr. Prytz, a federal search warrant was executed.

**INTERVIEW OF OPERATOR**

U.S. Postal Inspectors and a North Charleston Police Detective identified themselves to Mr. Prytz and advised him of the federal search warrant. Mr. Prtyz [sic] was also advised of his Miranda Rights and he agreed to answer questions. [Inspector Charlton] told Mr. Prytz [he] wanted to ask him about the package he just received. Mr. Prytz said he wished to cooperate and had nothing to hide. He stated he saw an advertisement in a swingers magazine and wrote to the advertiser for information. He said he purchased some video tapes which arrived today. He stated they were animal and golden shower tapes. [Inspector Charlton] asked him if he also bought child pornography tapes and he stated he did not. He said the tapes he ordered were adult tapes. [Inspector Charlton] questioned Mr. Prytz about his ordered tapes again and he reiterated he only ordered adult tapes.

[Inspector Charlton] then told Mr. Prytz [he] knew he was lying because he purchased the tapes from [his] undercover company and [he knew] he ordered seven tapes containing child pornography. [Inspector Charlton] showed him his original letters, check and order form and he iden-

tified them as his letters. He then admitted he did in fact order child pornography. He said he knew the tapes were described as containing children, but he didn't think they would send him child pornography.

Mr. Prytz was asked about U.S. Customs seizures of other ordered merchandise and he said he had ordered an animal tape from overseas which Customs seized. He said he doesn't know what the previous child pornography seizure by Customs refers to.

Mr. Prytz advised he buys tapes and that some of his tapes are copied from friends['] materials. He said he had no other child pornography in his apartment besides what came today.

[Inspector Charlton] asked Mr. Prytz why he ordered child pornography and he said he was curious. He said it was a stupid thing to do.

Mr. Prytz gave his consent to search his automobile and three other adult video tapes were seized from that location.

\*   \*   \*   \*   \*   \*

**ADDITIONAL DATA**

Two letters to Mr. Prytz from Just Looking, P.O. Box 681, Janesville, WS 53545 were found which indicated Prytz had written to Just Looking and expressed his interest in youth development. [Inspector Charlton knew] from ... experience that the term youth development refers to child pornography.

[Inspector Charlton] contacted a Wisconsin Postal Inspector and was advised that Just Looking was an undercover operation conducted by the Rock County Sheriff's Department. Contact with the Sheriff's Department disclosed Prytz answered an undercover advertisement and had later stated his preferred interest included youth development and family fun. [Inspector Charlton] also [knew] from ... experience investigating child pornography cases that the term family fun refers to child pornography materials.

Seized in the search of Mr. Prytz's apartment were a number of foreign advertisements for sexual materials depicting children under the age of 18.

**PERSONAL AND CRIMINAL HISTORY**

[Defendant's personal history deleted.]

**VICTIM IMPACT**

No known specific victims were impacted.... Government's Report, p. 2–7.

## III. ANALYSIS

Defendant's motions to dismiss and quash the indictment, and his motion to suppress evidence are before this court. Each motion will be addressed below.

### A. Motion To Dismiss

Defendant has moved to dismiss the indictment on the grounds that the government's conduct in the alleged "entrapment scheme" is so egregious and overplayed by investigative and prosecutorial misconduct as to violate fundamental due process of law. In response, the government argues that there has been no entrapment, no selective prosecution, and no investigative and prosecutorial misconduct involved in this case.

#### 1. Entrapment

■ Entrapment occurs when a law enforcement official originates the idea of a crime and then, for purposes of obtaining incriminating evidence against him, induces another person to engage in conduct that constitutes the crime when that person was not otherwise disposed to do so. *Sorrells v. United States*, 287 U.S. 435, 439–42, 53 S.Ct. 210, 212–13, 77 L.Ed. 413 (1932). If a defendant proves the government induced him to commit the crime charged, and the government fails to prove his predisposition to commit the crime beyond a reasonable doubt, then the defendant's entrapment is a complete defense as a matter of law. *Jacobson v. United States*, — U.S. —, —, 112 S.Ct. 1535, 1540, 118 L.Ed.2d 174 (1992).

■ Entrapment is an affirmative defense which requires a two-step analysis. The first step is to determine whether the defendant can prove that the government has "induced" him to commit the charged offense. *United States v. Osborne*, 935 F.2d 32, 38 (4th Cir.

1991). The court has the duty of determining whether or not the defendant has met this initial burden with proof beyond a mere scintilla, and the defendant who is unable to carry his burden is not entitled to the defense as a matter of law. *Id.*

If the defendant meets his burden of proving government inducement, step two of the analysis requires a determination as to whether the defendant had a predisposition to commit the charged crime. *Id.* at 38–39; *Jacobson,* —— U.S. at ——, 112 S.Ct. at 1540. The government then has the burden of proving "beyond [a] reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by Government agents." *United States v. Jones,* 976 F.2d 176, 179 (4th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2351, 124 L.Ed.2d 260 (1993); *Jacobson,* —— U.S. at ——, 112 S.Ct. at 1540.

■ Inducement is the initial threshold issue in the entrapment defense. It is clear in this case that the defendant was not induced. The facts illustrate that the government merely provided the defendant an opportunity to commit the offense. This is not enough to make a claim of government inducement. *See Jacobson,* —— U.S. ——, 112 S.Ct. at 1541 ("[w]here the defendant is simply provided with the opportunity to commit a crime, the entrapment defense is of little use....").[6] Proof of inducement requires more than proof of mere solicitation. *Osborne,* 935 F.2d at 37–39.

The defense is available only where the defendant establishes inducement by a showing of at least "persuasion or mild coercion" and "pleas based on need, sympathy, or friendship," *United States v. Nations,* 764 F.2d 1073, 1080 (5th Cir.1985), or by "grave threats, by fraud ..., or, in the usual case in which entrapment is pleaded, by extraordinary promises ... that would blind the ordinary person to his legal duties." *United States v. Evans,* 924 F.2d 714, 717 (7th Cir. 1991); *See also United States v. DeVore,* 423 F.2d 1069, 1071 (4th Cir.1970), *cert. denied,* 402 U.S. 950, 91 S.Ct. 1604, 29 L.Ed.2d 119 (1971). The facts of this case do not establish any coercion, threats, fraud or extraordinary promises.

■ Nothing about the government's contacts with Prytz give rise to the type of inducement that an ordinary person would not feel free to reject. The government had no contact whatsoever with Prytz until January 25, 1992, when Prytz sent a stamped self-addressed envelope to the M & D mail order company in response to an advertisement in a swinger's magazine for a free brochure regarding "videos, amateur, high-quality, made by swingers for swingers, all interests, over 350 titles." M & D was a business enterprise which had been taken over by the government after the August 1991 arrest of its prior owner for unlawful dissemination of obscene matters by mail. Therefore, in actuality, Prytz was not even initially responding to an advertisement authored by the govern-

---

6. In *Jacobson,* the United States Supreme Court found that the prosecution failed, as a matter of law, to adduce evidence that Jacobson was predisposed, independent of the government's acts and beyond a reasonable doubt, to violate the law by receiving child pornography through the mails. Jacobson was not simply offered the opportunity to order pornography, after which he promptly availed himself of that opportunity. Rather, he was the target of 26 (twenty-six) months of repeated government mailings and communications. The government not only excited Jacobson's interest in material banned by law but also exerted substantial pressure on him to obtain and read such material as part of the fight against censorship.

The government correctly points out to this court that Prytz's situation is distinguishable from Jacobson's:

The following item[s] differentiate this case from the recent Supreme Court ruling in *Jacobson* ... [:]
1) Prytz initiated contact by replying to an advertisement in a swingers magazine.
2) Prytz was tested one time and immediately ordered all child pornography materials offered to him.
3) Correspondence with Prytz only lasted from receipt of his initial letters postmarked January 25, 1992 to controlled delivery of his ordered materials on February 27, 1992.
4) All child pornography materials offered in the undercover literature [were] complete[ly] described as depicting minors under the age of 18 engaged in explicit sexual conduct.
Government's Report, p. 7–8.

ment. Rather, he was responding to one placed by M & D.

On January 31, 1992, undercover agent Inspector Charlton sent a one page advertisement letter and a one page, blank, general interest order form to Prytz noting the company's name change to Crystal's Video Universe (hereinafter "Crystals") and listing subject matter sex themes from "A" to "Z" for an individual to circle as indicative of his preferences. The general interest order form contained a warning—"Hard core sexual material—discard if offended"—and provided a specific check box where an individual could designate that he was not interested in the type materials advertised and could have his name removed from the mailing list.

On February 5, 1992, Prytz returned the general interest order form to Crystals, having circled five themes of sexual interest— animal, bull, dogs, incest and K–9 oldies. He checked the box on the form indicating his positive interest in these matters, and listed enemas and fisting as two interests not listed on the form. He signed the form and provided his mailing address, which was required for requesting more information from Crystals on the subject matter relating to his interests. Above Prytz's signature, the form read as follows:

> I swear I am an adult over the age of 21 and that all information requested is for my own personal use and not for resale. I understand these materials contain graphic sexual material and I do not object to such sexual material. I further swear I am not a police officer or postal inspector trying to entrap Crystal's Video Universe.

Government's Report, Exhibit # 8.

Experienced as a pornography investigator, it was Inspector Charlton's opinion that the term "incest" was synonymous with child pornography and the terms "animal, bull, dogs and K–9 oldies" were synonymous with bestiality.

On February 6, 1992, an undercover letter was sent to Prytz containing a blank order form and five lists of available tapes entitled (1) "GS and Pissing Tapes;" (2) "Incest Tapes;" (3) "Incest Video Tapes;" (4) "Farmyard Friends Videos;" and (5) "Adult Tapes." These lists contained approximately 119 titles. The "Incest Tapes" list stated *"Please keep this list confidential! These tapes all feature very young girls—2 to 10 years old and are very rare and hard to find." Id.* at Exhibit # 9. There were two tapes on this list: "Teaching Lolita Sex" and "Lolita Love Child." The "Incest Video Tapes" list contained five tapes: "Schoolboy Sex Orgie," "Masturbating Lolita," "Lolita Mother and Daughters," "Lolita Mother and One Daughter" and "Lolita Girls and Boys." The description for each of these tapes indicated that youths ranging from age 9 to 16 would be engaged in various types of sexual conduct.

On February 10, 1992, Prytz mailed a completed order form to Crystals ordering eleven videotapes at a cost of $390.00. Prytz enclosed a personal check for $390.00 dated February 7, 1992 with the order. The tapes ordered included: (1) "GS tape # 35;" (2) "Animal Lovers;" (3) "The Horny Dog;" (4) "Bull Orgy;" (5) "Schoolboys Sex Orgie;" (6) "Masturbating Lolita;" (7) "Lolita Mother and Daughters;" (8) "Lolita Mother and One Daughter;" (9) "Lolita Girls and Boy;" (10) "Teaching Lolita Sex;" and (11) "Lolita Love Child."

On February 26, 1992, while at the Crystals establishment, Charlton received an unsolicited telephone call from Prytz. Prytz confirmed that he had mailed his order on February 7, 1992. Prytz stated he was checking on his order because his personal check had not cleared and he had not gotten a response to his order.

On February 27, 1992, Prytz's order was delivered by United States mail to Prytz's apartment. Moments later, a search of his apartment was executed by Inspector Charlton pursuant to a search warrant.

Thus, the facts of this case overwhelmingly indicate that there was no government inducement of Prytz to commit the crime. At most, the facts indicate that the government's undercover operation merely solicited Prytz's response using a law enforcement technique which has been specifically approved by the United States Supreme Court. *Jacobson,* —— U.S. at ——, 112 S.Ct. 1535. "It is well settled that the fact that officers

or employees of the Government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution. Artifice and stratagem may be employed to catch those engaged in criminal enterprises." *Id.* —— U.S. at ——, 112 S.Ct. at 1540.[7]

The government made no threats, coercive or fraudulent statements or promises to Prytz. The defendant's proof of mere solicitation by the government is not enough to carry his burden of proving inducement, and therefore his defense of entrapment must fail. *Osborne*, 935 F.2d at 38.[8]

#### 2. Selective Prosecution

Prytz asserts that the government's decision to prosecute him was based on the fact that "the government improperly and incorrectly plundered raw Naval Investigative Services files referring to customs interception of two video tapes (allegedly pornographic, but not of children).... That the decision to prosecute was made based on such derivative and improper reports violated substantial constitutional rights of the Defendant.... [T]hat if such files would become accessible to the government it would represent and permit selective prosecution of anyone of recent military service which is constitutionally protected." Defendant's Motion To Dismiss, p. 2–3.

■ To support a claim of selective prosecution, the defendant must show both discriminatory motivation and discriminatory effect sufficient to raise a legitimate issue about the propriety of governmental conduct. *United States v. Joya–Martinez*, 947 F.2d 1141, 1145 (4th Cir.1991). To prevail in such a showing, Prytz must

[d]emonstrate 'both 1) that he has been singled out while others similarly situated have not been prosecuted *and* 2) that the decision to prosecute him was invidious or in bad faith; i.e., based upon such impermissible considerations as race, religion, or the desire to exercise his constitutional rights.'

*United States v. Schmidt*, 935 F.2d 1440, 1449–50 (4th Cir.1991), citing *United States v. Greenwood*, 796 F.2d 49, 52 (4th Cir.1986) (emphasis added).

■ Prytz cannot prove the first prong of the selective prosecution test in that there is no evidence that he was 'singled out' for prosecution. The evidence contains no information which could lead one to conclude that Prytz was singled out for prosecution while others in the same position were not prosecuted.

Furthermore, Prytz also fails to meet the showing required in the second prong of the test in that there is no evidence that the government's decision to prosecute was based on impermissible considerations. Inspector Charlton did not improperly "plunder" raw Naval Investigative Service files regarding Prytz. In fact, there is no mention whatsoever of Inspector Charlton obtaining any evidence regarding Prytz from the Naval Investigative Service. Inspector Charlton obtained a U.S. Customs "TECS" background check on Prytz, which indicated

---

7. *See infra* p. 10 and note 6 (distinguishing factual factors of *Jacobson*).

8. Since defendant has failed to prove government inducement, this court need not consider the defendant's predisposition to commit crime. This court, however, notes that predisposition exists in this case. As noted in *Osborne*:

[p]redisposition is found from the defendant's ready response to the inducement offered. It is sufficient if the defendant is of a frame of mind such that, once his attention is called to the criminal opportunity, his decision to commit the crime is the product of his own preference and not the product of government persuasion.

*Id.* The Fourth Circuit reiterated this holding in a post-*Jacobson* case, noting that the "government may meet its burden [of proving predisposi-

tion] by demonstrating the defendant's ready response to the inducement offered." *Jones*, 976 F.2d at 179.

On January 31, 1992, Prytz received a form on which to list his general sexual interests. Six days later, on February 5, 1992, Prytz returned the form, having listed, among topics, an interest in "incest." On February 6, 1992, Prytz was mailed a blank order form and videotape lists containing approximately 119 sexually oriented videotapes, including seven which were obviously child pornography as indicated by their graphic descriptions. Prytz ordered all seven child pornography videotapes on February 10, 1992, merely three days after receiving the form. Prytz's quick response to the solicitation demonstrates predisposition to commit the crime.

that he was the addressee of previously mailed foreign pornography and child pornography which had been seized by Customs.

The evidence is simply void of any discriminatory effect in the government's prosecution of Prytz. Therefore, his defense of selective prosecution is without merit.

### 3. Investigative and Prosecutorial Misconduct

■■■ Although analyzing sting operations in terms of entrapment, the Supreme Court noted in *Jacobson* that the investigative technique was constitutionally acceptable. The *Jacobson* Court stated:

> [T]here can be no dispute that the Government may use undercover agents to enforce the law. 'It is well settled that the fact that officers or employees of the Government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution. Artifice and stratagem may be employed to catch those engaged in criminal enterprises.'
>
> *  *  *  *  *  *
>
> Thus, an agent deployed to stop the traffic in illegal drugs may offer the opportunity to buy or sell drugs, and, if the offer is accepted, make an arrest on the spot or later. In such a typical case, or in a more elaborate 'sting' operation involving government sponsored fencing where the defendant is simply provided with the opportunity to commit a crime, the entrapment defense is of little use because the ready commission of the criminal act amply demonstrates the defendant's predisposition. Had the agents in this case simply offered petitioner the opportunity to order child pornography through the mails, and petitioner—who must be presumed to know the law—had promptly availed himself of this criminal opportunity, it is unlikely that his entrapment defense would have warranted a jury instruction.

*Id.* — U.S. at ——, 112 S.Ct. at 1540–41. The standard for determining what government actions constitute a violation of due process is whether or not the conduct is "so outrageous as to shock the conscience of the court." *Osborne,* 935 F.2d at 36; *Jones,* 976 F.2d at 181.

It is clear from the above discussion of the Prytz investigation that there was no outrageous governmental conduct involved. Prytz was merely afforded the opportunity to commit the crime, and Prytz quickly took advantage of that opportunity. As a result, Prytz's defense of outrageous governmental conduct fails.

Based on the above, defendant's motion to dismiss the indictment on the grounds of entrapment, selective prosecution and governmental misconduct is denied.

### B. Motion to Quash

■■■ Defendant has further moved to quash the indictment on the grounds that 18 U.S.C. § 2252 violates the First Amendment of the Constitution and that the conduct of the government and its misuse of the Child Protection Act rises to a level of constitutional violation of fundamental due process of law, the First and Fourteenth Amendments. Again, Prytz's defenses of entrapment, selective prosecution and investigative and prosecutorial misconduct fail under the facts of this case. Therefore, the only argument remaining concerning defendant's motion to quash is that 18 U.S.C. § 2252 is unconstitutional. This the court will address below.

In support of his argument that 18 U.S.C. § 2252 is unconstitutional, Prytz cites *United States v. X–Citement Video, Inc.,* 982 F.2d 1285 (9th Cir.1992). In *X–Citement,* the Ninth Circuit held that § 2252 was unconstitutional on its face because it lacked a scienter element. Apparently, the Ninth Circuit is the only circuit to construe § 2252 as lacking the level of scienter necessary to pass constitutional muster. In *X–Citement Video,* the Ninth Circuit relied upon an earlier case, *United States v. Thomas,* 893 F.2d 1066 (9th Cir.), *cert. denied,* 498 U.S. 826, 111 S.Ct. 80, 112 L.Ed.2d 53 (1990), in which it had held that § 2252 does not require knowledge that the material involves a minor or any knowledge of the contents of the material. 982 F.2d at 1289–90. The *X–Citement Video* court concluded that it was bound by the *Thomas* holding that § 2252 does not contain any element of scienter requiring knowledge

that the materials were child pornography. *Id.* at 1290.

The *X–Citement* court then determined "that the constitutional minimum requirement of scienter for the Act's proscription of transporting or receiving child pornography is knowledge that at least one of the performers is under age 18." *Id.* at 1291. The court concluded that "the First Amendment mandates that a statute prohibiting the distribution, shipping or receipt of child pornography require knowledge of the minority of the performers as an element of the crime it defines." *Id.* at 1291–92. Because § 2252, as interpreted in *Thomas,* did not require any such element, the *X–Citement* court held that § 2252 was facially invalid. *Id.* at 1292.

The Ninth Circuit adhered to a strict grammatical interpretation of § 2252 to conclude that the statute lacks the requisite scienter. The relevant language of § 2252(a) provides that "any person who knowingly receives, ... any visual depiction ... which contains materials ..., if the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct ..." is criminally liable. 18 U.S.C. § 2252(a). In *Thomas,* the Ninth Circuit concluded that "knowingly" modifies only "receives" and, thus, does not require knowledge that the visual depictions involve the use of minors. Although this interpretation may be correct grammatically, it is not reasonable nor consistent with principles underlying constitutional interpretation of statutes and the courts' obligation to construe statutes to avoid unconstitutionality if possible. *Osborne v. Ohio,* 495 U.S. 103, 118, 110 S.Ct. 1691, 1701, 109 L.Ed.2d 98 (1990).

The Ninth Circuit apparently stands alone in its reasoning that § 2252 is unconstitutional. This court joins the majority and finds that the language of § 2252 imposes a scienter element as to the nature of the proscribed visual depictions. Section 2252(a)(2) requires that the defendant "knowingly" receive or reproduce child pornography. Contrary to the Ninth's Circuit's conclusion in *Thomas* and *X–Citement Video,* "knowingly" does not modify only "receive" and "reproduce" but, rather, it modifies the entire paragraph.

Because the statute is constitutional and the indictment adequately alleges knowledge consistent with the above interpretation, defendant's motion to quash on the ground that § 2252 is unconstitutional is denied.

## C. Motion To Suppress

■ Finally, defendant moves to suppress evidence seized during a search of his home on February 27, 1992 on the ground that there was insufficient probable cause to support a search warrant for child pornography that was the subject of a controlled mail delivery, where pornographic materials were not present at the place to be searched at the time the search warrants were issued. The Fourth Circuit, however, has affirmed the use of anticipatory search warrants in at least two cases similar to the one at bar. In *United States v. Goodwin,* 854 F.2d 33, 36 (4th Cir.1988), the court held that the standard for determining the validity of an anticipatory search warrant in controlled mail delivery cases is whether the contraband is "on a sure course to its destination." The *Goodwin* court found the prior issuance of a warrant permissible based on the following facts:

> Inspector Northrop's affidavit described in detail correspondence with Goodwin evidencing his predisposition, the verification of his residence, and his requests for specific materials. In paragraphs 19 through 21 of the affidavit, Northrop explained that he would cause the materials to be delivered via the mails. Because it is undisputed that these events occurred, we think the affidavit sufficed to establish probable cause.

*Id.* at 36.

The *Goodwin* case is factually similar to the case at bar. Test letter offerings were sent to the defendant who quickly responded with affirmations of his interest in child pornography. Goodwin placed an order for child pornography on May 14, 1987, and, on June 10, 1987, a controlled mail delivery of the child pornography he ordered was mailed to his house. Pursuant to an anticipatory search warrant, his house was searched and the contraband items seized.

322

In *United States v. Dornhofer,* 859 F.2d 1195 (4th Cir.1988), *cert. denied,* 490 U.S. 1005, 109 S.Ct. 1639, 104 L.Ed.2d 155 (1989), the Fourth Circuit again upheld an anticipatory search warrant in a case similar to the one at bar. The court concluded that the anticipatory search warrant was valid because the magistrate conditioned the validity of the warrant on the child pornography being placed in the mail. Once the contraband was placed in the mail, the court found that it was on a sure course to its destination, and therefore affirmed the warrant's validity.

Based on the above, defendant's motion to suppress is denied.

## IV. CONCLUSION

It is therefore,

**ORDERED,** that defendant's motion to dismiss the indictment be **DENIED.**

**ORDERED,** that defendant's motion to quash the indictment be **DENIED.**

**ORDERED,** that defendant's motion to suppress evidence be **DENIED.**

**AND IT IS SO ORDERED.**