Filed:  May 20, 1998

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 97-4284
(CR-96-335-CCB)

United States of America,

Plaintiff - Appellee,

versus

Vaughn Monroe Sligh,

Defendant - Appellant.

O R D E R

The Court amends its opinion filed April 29, 1998, as follows:

On page 2, first paragraph of opinion, line 1 -- a comma is added in "$7,000."

On page 4, first full paragraph, line 4 -- a comma is added after the phrase "in Sligh's mind."

On page 10, first full paragraph, line 2 -- a comma is added after the word "overtures."

For the Court - By Direction

/s/ Patricia S. Connor

Clerk

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                           No. 97-4284

VAUGHN MONROE SLIGH,
Defendant-Appellant.

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Catherine C. Blake, District Judge.
(CR-96-335-CCB)

Argued: January 26, 1998

Decided: April 29, 1998

Before LUTTIG, Circuit Judge, PHILLIPS, Senior Circuit Judge,
and MORGAN, United States District Judge for the
Eastern District of Virginia, sitting by designation.

_____

Reversed and remanded by published opinion. Judge Luttig wrote the
majority opinion, in which Judge Morgan joined. Senior Judge Phil-
lips wrote a dissenting opinion.

_____

**COUNSEL**

**ARGUED:** Harry Levy, SCHULMAN, TREEM, KAMINKOW &
GILDEN, P.A., Baltimore, Maryland, for Appellant. William Warren
Hamel, Assistant United States Attorney, Baltimore, Maryland, for
Appellee. **ON BRIEF:** Kenneth W. Ravenell, Andrew H. Levine,

SCHULMAN, TREEM, KAMINKOW & GILDEN, P.A., Baltimore, Maryland, for Appellant. Lynne A. Battaglia, United States Attorney, Baltimore, Maryland, for Appellee.

_____

**OPINION**

LUTTIG, Circuit Judge:

Defendant Vaughn M. Sligh paid a $7,000 bribe to an IRS agent to change his tax debt to "uncollectible" status, and was thereafter indicted for bribery, payment of an illegal gratuity, and interference with the administration of the Internal Revenue Laws. At trial, Sligh admitted to paying the bribe to the IRS employee, but offered the defense of entrapment in his opening statement. After the close of the government's evidence and after most of the defense case (but prior to the defendant's testimony), the defense sought a ruling as to whether the court intended to instruct the jury on entrapment. The court ruled that Sligh was not entitled to an entrapment defense because there was insufficient evidence from which a jury could find government inducement. J.A. at 327-28.

Sligh then entered into a plea agreement, which preserved his right to appeal the district court's ruling on entrapment and the court's related evidentiary ruling, which barred the defense from presenting evidence about the IRS agent's attendance at a bribery awareness seminar and her training and experience in bribery. The court sentenced Sligh to five months imprisonment.

Because a jury could reasonably conclude that Sligh was entrapped by the IRS agent with whom he dealt, Sligh was entitled to the entrapment instruction he requested. Accordingly, we vacate Sligh's convictions and remand to the district court for further proceedings.

I.

An entrapment defense has two elements: government inducement and the defendant's lack of predisposition to commit the crime. See United States v. Daniel, 3 F.3d 775, 778 (4th Cir. 1993). Entrapment

2

is an affirmative defense, and the defendant has the initial burden to "produce more than a scintilla of evidence that the government induced him to commit the charged offense," id., before the burden shifts to the government to prove beyond a reasonable doubt that the defendant was predisposed to commit the crime, United States v. Jones, 976 F.2d 176, 179 (4th Cir. 1992) (noting that once a defendant has met "his initial burden of presenting evidence that the government induced him to commit the crime, the government has the burden of proving `beyond reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by Government agents'" (quoting Jacobsen v. United States, 503 U.S. 540, 549 (1992)) (other citations omitted)); see also United States v. Singh, 54 F.3d 1182, 1189 (4th Cir. 1995) ("[T]he defendant must produce `sufficient evidence from which a reasonable jury could find' that the government induced him to commit the charged offense." (citation omitted)). A defendant is not entitled to an entrapment instruction unless he can meet this initial burden of producing some evidence of government inducement. See United States v. Osborne, 935 F.2d 32, 38 (4th Cir. 1991).

"`Inducement' is a term of art: it involves elements of governmental overreaching and conduct sufficiently excessive to implant a criminal design in the mind of an otherwise innocent party. Solicitation, by contrast, is the provision of an opportunity to commit a criminal act." Daniel, 3 F.3d at 778 (citation omitted). A showing of mere government solicitation is insufficient to merit an entrapment instruction "because solicitation by itself is not the kind of conduct that would persuade an otherwise innocent person to commit a crime, or that would be `so inducive to a reasonably firm person as likely to displace mens rea.'" Osborne, 935 F.2d at 38 (citations omitted).

Applying these principles, we believe a jury could readily conclude that the IRS crossed the line between solicitation and inducement in its interactions with the defendant. From the telephone conversations discussed below, a jury could find that the IRS agent first refused to provide Sligh with even rudimentary information concerning the agency's guidelines on debt reduction which would have enabled him to evaluate whether he was entitled to relief, thus forcing him to play a guessing game with her as to whether his circumstances would entitle him to relief under the agency's rules. It could find that, despite

3

the IRS agent's efforts to characterize Sligh's necessarily uninformed questions as offers of wrongdoing, it was not Sligh, but the agent herself, who actually initiated the suggestion of wrongdoing. It could further find that Sligh repeatedly ignored the agent's invitations to wrongdoing, but that the agent nevertheless persisted in her baiting of Sligh. It could also reasonably find that when Sligh still did not accept the agent's overtures to wrongdoing, the agent introduced, as well, the specific idea of a bribe. And, finally, the jury could find that Sligh continued to ignore even these official invitations to bribery until the moment the bribe was offered.

Based upon these findings, the jury in turn could reasonably conclude that the IRS did much more than provide Sligh with an opportunity for criminal conduct to which he was predisposed. It could conclude that the IRS implanted the criminal design in Sligh's mind, and, in a deliberate effort to realize the design it implanted, the agency overreached in a manner and to a degree that it must be said that Sligh was the victim of government entrapment.

II.

Sligh had numerous contacts and conversations with the IRS before the day on which he offered the bribe which is the subject of this appeal. After initial conversations with two other IRS agents, Sligh's primary contacts were with Nancy O'Neill, manager of the Automated Collection group in Baltimore. Between May 16 and June 13, 1996, Sligh spoke with O'Neill five times, sometimes for as long as an hour.

During these conversations, Sligh told O'Neill that he intended to complete and file his tax returns, and O'Neill established a deadline for him to do so. J.A. at 57-59, 96. Sligh and O'Neill discussed a levy the IRS had placed on Sligh's bank account, numerous letters Sligh had sent to the IRS requesting that the IRS explain why he was obligated to pay taxes, and the possibility of payment of outstanding taxes through a home equity loan. J.A. at 57-59, 95-96. They also discussed the possibility that Sligh might not owe money or might be entitled to a refund, and O'Neill stated that, under those circumstances, she would consider removing the levy from Sligh's bank account. J.A. at

4

98-99. O'Neill advised Sligh that she had the power to remove the levy on his account. J.A. at 99.

Sligh initiated several of these conversations, calling to update O'Neill on his progress in completing his tax returns. On June 4, 1996, Sligh called O'Neill to request some additional forms in order to file his return. J.A. at 61. On June 6, 1996, Sligh contacted O'Neill and spoke with her briefly to inform her that he had completed his 1995 tax return and that he owed several thousand dollars in 1995 taxes. J.A. at 102-03. On June 13, 1996, Sligh spoke with O'Neill for a fifth time and requested additional time to file his returns. O'Neill granted him a short extension to June 24, 1996. J.A. at 63, 104-06.

O'Neill admits that during these many conversations, Sligh did not offer a bribe, suggest that he was willing to offer a bribe, or in any way allude to a bribe. J.A. at 105. Nor did Sligh allude to any other form of wrongdoing. In fact, O'Neill testified that, during this time, she believed Sligh was endeavoring to complete his tax returns. J.A. at 99. And, indeed, all evidence indicated that Sligh intended to file his missing returns and arrange for payment.

<u>Then, on June 14, 1996, O'Neill attended an IRS bribery aware-ness course.</u> J.A. at 106.*

Ten days later, Sligh telephoned O'Neill again. And, again, in this sixth conversation, Sligh did not even allude to, much less offer, a bribe to O'Neill. In fact, in this conversation, Sligh informed O'Neill that he had gone to the IRS office in Baltimore; that he had obtained assistance in preparing his tax returns; that he wanted to provide O'Neill with information from the completed forms for 1990, 1991, and 1994; that he owed taxes for all three of those years; and that he was mailing the tax returns. J.A. at 63-64, 155-57.
_____

* The district court excluded evidence regarding O'Neill's attendance at the bribery awareness seminar and her training and experience in iden-tifying bribery attempts. Because, apart from its relevance to the IRS agent's subjective state of mind, this evidence is of obvious relevance to an objective evaluation of the government's interaction with Sligh, the exclusion of this evidence was in error.

Three days later, Sligh again called O'Neill and requested a short extension of time for filing his 1994 return so that he could investigate a possible moving expenses deduction. J.A. at 163-64. During this call, O'Neill reviewed Sligh's financial statement and calculated a monthly payment figure for Sligh to pay off his tax debt. J.A. at 64-68. The conversation lasted approximately an hour. J.A. at 68, 163-64. At the end of the conversation, O'Neill asked Sligh if he had any questions. J.A. at 68. According to O'Neill, Sligh "lowered his voice and asked me how much power do I have." Id. O'Neill replied, "[W]hat do you mean?", J.A. at 69, and Sligh asked, "[C]an you take care of part of it?" Id.

At this, although Sligh had said nothing at all that would prompt a reasonable person to conclude that he was offering or about to offer O'Neill a bribe, O'Neill later testified: "a chill went down my spine because I knew at that point he was going to try to bribe me or do something." Id.

Based only upon Sligh's question whether O'Neill had the power to take care of part of his existing debt, O'Neill asked if she could call Sligh back. She then immediately contacted the IRS Internal Investigation Office, which placed a listening device on O'Neill's telephone and arranged for her to make a recorded call to Sligh later that day. J.A. at 70-71.

During the later, recorded conversation that same day, O'Neill confirmed to Sligh that she did have the power to take care of part of the debt under certain circumstances: "I have the uh, power to adjust your balance due under certain criteria, but I need a reason." J.A. at 482. Upon this confirmation of O'Neill's power, Sligh did not offer a bribe as O'Neill had apparently expected he would. Rather, in an attempt to offer reasons that would bring him within the agency's guidelines for debt reduction, Sligh explained that he had not received a timely response to his letters to the IRS and that he wanted to pay about half of what he owed. J.A. at 482-83. O'Neill then explained two legal options for reducing what Sligh owed the IRS -- offer and compromise or penalty abatement requests -- and that she would need a "reasonable cause" to pursue either option. J.A. at 483. Sligh offered a variety of reasons that his debt should be reduced, including work stress, white racism, and his lack of information about how the system

6

worked. J.A. at 483-85. O'Neill responded that she understood his situation and wanted to help, and stated "I just need some way or reason"; she also explained that reasons like racism were not going to "cut it" as the "official reason." J.A. at 485.

Throughout this conversation, and indeed throughout all of her conversations with Sligh, O'Neill withheld from Sligh the information that would permit him to make an informed decision as to whether he had a reason for reduction of his debt that would fit within the guidelines. Indeed, O'Neill refused to give Sligh any guidance about what sort of reasons were legitimate or sufficient under the guidelines. Sligh, thus, continued to offer a variety of reasons for reducing his tax debt, none of which apparently fit within the IRS guidelines, including the fact that the IRS had not answered his letters asking why he had to pay taxes, that he had a daughter he needed to put through college, and that he was hard-working. J.A. at 486-88.

Eventually, as Sligh continued to offer reason after reason that might possibly justify reduction or waiver of his debt, O'Neill initiated a suggestion that Sligh might ask her to engage in wrongdoing by departing from what the guidelines required:

> O'Neill: I need a legitimate reason to cut [your] balance
> in half.
>
> Sligh: Yes, ma'am.
>
> O'Neill: Unless, you're asking me to [do] something
> otherwise. Is that what you're asking?

J.A. at 496 (emphasis added). In response to what O'Neill presumably believed was a direct solicitation of the bribe she had concluded Sligh intended to offer her, Sligh said only the following:

> Sligh: Well, I don't know what you're able to do.
> Really, I don't, I don't know what you're able to
> do. You know?
>
> O'Neill: I can do anything within reason.

7

> Sligh:   Yes ma'am.

Id.

Then almost as if she had been urged to do so to avoid a suggestion of improper inducement, O'Neill corrected herself to say not that she could do anything within reason, but that she needed a reason, in order to reduce Sligh's debt: "Oh, and I'm sorry, I'm sorry, I mis-spoke, I mean, I need a reason." Id. Still, Sligh never even as much as suggested wrongdoing, much less a bribe. He simply repeated his request that O'Neill tell him what the guidelines were: "Well, see I can't, I can give you my reason, you know, but my reason just might not fit within your guidelines. So, I guess what I'm saying to you, you give me the guidelines and I can work out a reason within those guidelines." Id.

Despite O'Neill's initiation of the suggestion that Sligh ask her to depart from the guidelines, Sligh did not do so, and merely continued to offer reasons that might satisfy the guidelines which O'Neill refused even to describe to him. And, although Sligh had done nothing other than ask O'Neill to exercise whatever power she possessed to reduce his tax debt and attempt, not knowing what the IRS' guidelines were, to provide her with legitimate reasons for doing so, O'Neill persisted in her suggestion that Sligh might (or should) ask her to do something unauthorized:

> O'Neill:   . . . unfortunately, based on what you've told me, there's not really anything I can do.
>
> Sligh:     (Sighs) You're saying there's nothing you can do.
>
> O'Neill:   Not, not for those reasons.
>
> Sligh:     Hum. So you're saying the reasons that I gave you are not within the guidelines that you have before you?
>
> O'Neill:   Right.
>
> Sligh:     That's what you're saying.

8

O'Neill:   Yes.

Sligh:    Okay. But you're not at liberty to tell me what
          the guidelines are?

O'Neill:   No, I mean I have to do it based on what you tell
          me, not me giving you the guidelines, <u>unless you
          wanted me to deviate</u>.

J.A. at 501 (emphasis added).

Still, rather than take the agent's bait, Sligh simply replied, "Well,
you know, for, you know, if it's a matter, (Laughter) if it deviates, I
don't you know, I don't care, you know," <u>id</u> . -- an answer that
appears to reflect no more than Sligh's understandable indifference as
to whether, in his case, the IRS followed the technical guidelines,
which the agent refused even to explain to him, or made an exception
for him.

Obviously aware at this point that Sligh had no apparent intention
to offer a bribe and that she was having no success in steering him
toward the offer of a bribe, O'Neill then invited a bribe more explic-
itly by asking Sligh, in essence, "What's in it for me?":

O'Neill:  <u>But why would I take that risk?</u>

Sligh:    Cause you love me? (Laughter) You know, I
          don't know. I mean, you know what --

O'Neill:   I'd be risking my job.

<u>Id</u>. (emphasis added).

At this point, Sligh had still never suggested that O'Neill engage
in any sort of wrongdoing, much less suggested that he would offer
a bribe. Nevertheless, O'Neill continued to act as though Sligh had,
in fact, already suggested as much, and stated that what Sligh was
asking her to do "[wa]sn't really right." J.A. at 503. Despite O'Neill's
explicit recharacterization of Sligh's entirely appropriate request for

9

guidance as a request that she engage in wrongdoing or that she accept a proffered bribe, Sligh yet again resisted O'Neill's overtures and continued to try to convince her to reduce his balance by citing other reasons he believed might be legitimate, like the fact that the house he grew up in was lost to taxes. Id.

O'Neill, seemingly frustrated that Sligh had not responded to any of her overtures, then resorted to even more explicit invitations:

> O'Neill: Okay. Um, you know, what you were saying before, I mean, I'd like to help you out, um, you're asking me to do a favor that I have to fal-sify for some reason why I need a reason to take such a, take a risk in that kind of situation.

> [Sligh said that he could be suicidal if it made her feel better and that he wished God would give him the words to say to her.]

> O'Neill: Oh. Um, Do you want me to make up a reason?

> Sligh: (Sighs)

> O'Neill: Is that what you're asking?

> Sligh: Ma'am, I don't want to go to jail okay? And um, you know, I don't know, who, is this recorded?

> O'Neill: No, uh uh.

> Sligh: Um, then um, yeah. (Laughter.) And I would say that I would be forever in your debt and I would, uh --

> O'Neill: Well, I could go to jail, too.

> Sligh: Ma'am, anything you would say I would agree with.

> O'Neill: Uh huhn.

10

> Sligh:    So, you know, only thing I have is me, and you
>            and God right now. That's all I have. That's it.
>
> O'Neill:  Yeah, I mean I, I just can't take that kind of risk.

J.A. at 506-07 (emphasis added).

Sligh, at this point, finally appears to have assented at least to O'Neill's suggestion that she make up a reason to justify reducing his tax debt, but he still had not given any indication whatsoever that he intended to offer her a bribe. Indeed, when O'Neill continued to state that she did not think taking the "risk" was worth it for her, rather than offer her a bribe to make it "worth" her while, Sligh instead only attempted to appeal to her sympathies by urging her to meet with him and his family. J.A. at 507-10.

O'Neill then took the extraordinary step of agreeing to meet with Sligh, and the further extraordinary step of refusing to allow Sligh's wife to be present, explaining, despite any predicate from Sligh, that she did not want Sligh's wife to know that he was "doing something that's not legal, necessarily." J.A. at 510. Thus, O'Neill once again reintroduced the idea of a bribe into her conversation with Sligh, even though Sligh had never made such an overture and in fact had ignored O'Neill's multiple suggestions of wrongdoing and her initial suggestions of a bribe.

Even so, Sligh yet again explicitly and categorically resisted O'Neill's attempt to solicit a bribe, responding: "No ma'am, that's not what I'm saying. . . . I just want to, to comfort you. To let you know that, you know, I'm not, you know, I'm a genuine person." Id. Finally, even during the lunch meeting at which Sligh eventually did offer to make O'Neill a bribe, he initially continued to offer other reasons why O'Neill should reduce his tax debt, J.A. at 529-533, before eventually offering to make the bribe for which he now stands convicted. And, of course, Sligh did not even have with him at this meeting the money that he ultimately promised O'Neill in return for her reduction of his tax debt.

We are convinced that a jury quite well could conclude, and reasonably so on the strength of these facts, that Sligh's bribe of O'Neill

11

was, in reality, the crime of an overzealous bureaucrat who, because of her recent "training," if not for other reasons also, was bent upon finding the nefarious in the wholly innocent; that this employee not only implanted the bribery scheme in a mind that had never contemplated bribery, but then overreached in her zeal to have that design acted upon. That is, we are satisfied that a jury could reasonably conclude that the IRS, far from merely creating the opportunity for illegality, conceived and inspired the illegality in the face of the defendant's demonstrated lack of predisposition to any crime at all. The defendant therefore was entitled to an instruction that would enable a jury to find that he was a victim of government entrapment, and it was error for the court not to have agreed to give such an instruction.

III.

The judgment of the district court is reversed, and the case remanded for such further proceedings as may be necessary.

REVERSED AND REMANDED

PHILLIPS, Senior Circuit Judge, dissenting:

I think the district court properly ruled that the evidence did not suffice to require submission of an issue of entrapment to the jury. Though Agent O'Neill's endeavors leading up to Sligh's offer of a bribe were persistent, possibly deceitful in some respects, and surely intended to invite the end result, they fell well short of the kind of overreaching government conduct that we have considered necessary to support an entrapment defense. I therefore dissent and would affirm the conviction for the conceded bribe offer.

The majority correctly states the controlling legal principles of entrapment, both substantive and procedural. Under those principles, the only issue before us is whether there was evidence "more than a scintilla" from which a jury properly could find that O'Neill's conduct crossed the line between permissible "solicitation" of the bribe--merely providing an opportunity for its offer--and possibly exculpating "inducement" of the offer--actually causing a criminal intent in

12

Sligh's mind that would not otherwise have existed. See United States v. Daniel, 3 F.3d 775, 778 (4th Cir. 1993) (differentiating the two). While the weight or quantity of the required evidence of inducement is slight, the content requirement is rigorous. The conduct evidenced must be so severe and pervasive that it can legitimately be viewed as sufficient to overcome the will of a reasonable person. See Crisp v. United States, 262 F.2d 68, 69 (4th Cir. 1958). As we have characterized it more recently, it must involve "governmental overreaching" sufficient "to implant a criminal design in the mind of an innocent party," United States v. Phan, 121 F.3d 149, 154 (4th Cir. 1997), cert. denied, 118 S. Ct. 1038 (1998) (footnote omitted), and as conduct "likely to displace mens rea." United States v. DeVore, 423 F.2d 1069, 1072 (4th Cir. 1970). And it is insufficient to meet this inducement requirement merely to establish that the government was the first to suggest the illegal conduct. See United States v. El-Gawli, 837 F.2d 142, 149 (3d Cir. 1988).

Short of conduct actually calculated to "implant a criminal design" in an innocent mind--no inconsiderable feat--federal law has long permitted, out of perceived necessity, law-enforcement endeavors that invite criminal conduct, or make it convenient, or that employ "[a]rtifice and stratagem" in order to "catch those engaged in criminal enterprises." Jacobson v. United States, 503 U.S. 540, 548 (1992) (citing Sorrells v. United States, 287 U.S. 435, 441 (1932); Sherman v. United States, 356 U.S. 369, 372 (1958); United States v. Russell, 411 U.S. 423, 435-36 (1973)). In deference to this recognized necessity, the federal courts have in general found a basis for allowing an entrapment issue to go to the jury only in unique and compelling situations. See United States v. Gendron, 18 F.3d 955, 961-62 (1st Cir. 1992) (collecting cases). Examples include physical threat, see United States v. Becerra, 992 F.2d 960, 963 (9th Cir. 1993) (physical threats to defendant's family); and falsely-based appeals to sympathy, see United States v. Nations, 764 F.2d 1073, 1080 (5th Cir. 1985) (false claims of cancer to induce aid in selling stolen cars).

The evidence here, though it surely could be thought to demonstrate a relentlessly pursued "artifice or stratagem" by O'Neill to "catch" Sligh, shows no such overreaching. No threats were ever made. Compare United States v. Skarie, 971 F.2d 317, 320 (9th Cir. 1992) (finding threats of impaling the defendant and harming her son

13

sufficient to constitute inducement). Requests to violate the law (even if made) were not consistent and overwhelming. Compare United States v. Joost, 92 F.3d 7, 13 (1st Cir. 1996) (finding evidence of inducement where government created a dependent relationship between agent and known felon and where governmental contacts were repeatedly made over an extended period of time); United States v. Groll, 992 F.2d 755, 759 (7th Cir. 1993) (finding inducement where government agent called defendant every day for over a month and then threatened her when she appeared to be backing out of drug sale). Nor was Sligh "wined and dined" in a manner that could have implanted any previously unheld criminal design in his mind. Compare United States v. Fedroff, 874 F.2d 178, 184-85 (3d Cir. 1989) (finding inducement where government agents paid for defendant's expensive meals and gambling trips in an effort to get him accustomed to the lifestyle). No fraudulent misrepresentations were put forth and there was never an attempt to play on the feelings or personal weaknesses of Sligh. Compare United States v. Martinez, 122 F.3d 1161, 1164-65 (9th Cir. 1997) (finding inducement where government agent repeatedly promised friendship and wealth); United States v. Montanez, 105 F.3d 36, 39 (1st Cir. 1997) (reversing drug distribution conviction because jury was not instructed on appeals to sympathy as a basis for inducement). In short, my reading of the evidence is that up to the very end of the obviously wary negotiations being conducted with O'Neill, had Sligh not wanted all along to offer O'Neill a bribe "all he had to do was say no and walk away." United States v. Wilson, 129 F.3d 949, 951 (7th Cir. 1997). Consider the final exchange leading up to the fatal offer. It opens with O'Neill's legitimately closing off the several routes of a possible legal fix that had been intimated over the course of the protracted conversations-- prolonged as much by Sligh as by O'Neill,

> O'Neill:  So, based on that particular route, there's nothing I can do.

> Sligh:    Right. But you know, that something can be done.

> O'Neill:  Uh huhn.

> Sligh:    Because that's what you do.

14

O'Neill: Yeah.

Sligh: And I'm sure you seen many different types of case changes, where they were able to be handled. So, if that's something that's possible, and uh, only thing I need to know--

O'Neill: Okay--

Sligh: --is what I need to do to make that uh, transpire.

O'Neill: Okay. I guess I need to know from you, what exactly are you asking me to do (Laughter).

Sligh: Uh, oh boy, oh boy, oh boy. Is it just you and me?

O'Neill: Yeah, just you and me.

Sligh: You drove a car?

O'Neill: Yup. I have my own car, yup, they gave me a license . . . .

Sligh: So, how much you owe on it?

O'Neill: Twenty-three hundred . . . .

Sligh: All right. So, uh, as a, as a, kind and giving person, I can help you own it.

These are not the words of an overwhelmed wary innocent whose will to obey the law has been overborne by the implanting of a criminal design not his own. A jury should not be permitted to speculate on that possibility as the district court quite properly concluded.

In conclusion, I venture that the majority has been led astray from the proper entrapment analysis by an undue absorption with and apparent outrage at the objective nature of O'Neill's conduct--to the

15

point of suggesting that it amounted to the "crime of an overzealous bureaucrat." <u>Slip op.</u> 12. The Supreme Court long ago in <u>Sorrells</u> specifically rejected, as decisive of the entrapment issue, the objective purity or impurity of the Government's conduct. <u>See Sorrells</u>, 287 U.S. at 441. The specific motivation for O'Neill's conduct, whether prompted by her attendance at a bribery seminar, or by innate zeal, or vigor, or whatever, is irrelevant under federal-entrapment doctrine as I understand it. Accordingly, I think that the district court, properly recognizing this, rightly declined to allow in the proffered evidence of O'Neill's attendance at the seminar.

I would affirm the conviction for this conceded violation of the federal bribery statute.

16