**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.                                                                       No. 98-4329

DUANE YEMY JOHNSON,
<u>Defendant-Appellant.</u>

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.                                                                       No. 98-4337

ALANI OLUSEGUN ARAWOLE,
<u>Defendant-Appellant.</u>

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.                                                                       No. 98-4348

EMANUEL IZUCHUKWU IBEZIM,
<u>Defendant-Appellant.</u>

Appeals from the United States District Court

for the District of Maryland, at Baltimore.
Benson E. Legg, District Judge.
(CR-97-283-L)

Argued: March 4, 1999

Decided: July 27, 1999

Before HAMILTON and TRAXLER, Circuit Judges,
and LEE, United States District Judge
for the Eastern District of Virginia, sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** James Joseph Nolan, Jr., PIERSON, PIERSON &
NOLAN, Baltimore, Maryland, for Appellant Johnson; Joan Catherine Fraser, LAW OFFICE OF JOAN C. FRASER, Baltimore, Maryland, for Appellant Arawole; Gerald Chester Ruter, Baltimore, Maryland, for Appellant Ibezim. John Francis Purcell, Jr., OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF:** Lynne A. Battaglia, United States Attorney, Angela R. White, Assistant United States Attorney, Baltimore, Maryland, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See
Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Following a jury trial, Duane Yemy Johnson (Johnson), Emanuel Izuchukwu Ibezim (Ibezim), and Alani Olusegun Arawole (Arawole) were convicted of conspiracy to possess heroin with the intent to distribute and to distribute heroin in violation of 21 U.S.C. §§ 841(a)(1) and 846. In addition, Johnson and Ibezim were convicted of possession of heroin with the intent to distribute and aiding and abetting the same in violation of 18 U.S.C. § 2 and 21 U.S.C. § 841(a)(1). Arawole was also convicted of possession of heroin with the intent to dis-

tribute in violation of 21 U.S.C. § 841(a)(1). On appeal, Johnson, Ibezim, and Arawole raise numerous challenges to their convictions. For the reasons set forth below, we affirm.

I

Paul Atueyi (Atueyi), a Nigerian, came to the United States in June 1977. In 1989, he began to import heroin. Atueyi was arrested in May 1992 and eventually pled guilty to importation of heroin in June 1992. Thereafter, while he was incarcerated awaiting sentencing, Atueyi cooperated with the government by testifying in three criminal trials. In April 1996, he was sentenced to forty-eight months' imprisonment, and, at that time, he was released for time served.

Following his release in April 1996, Atueyi moved from New York to Baltimore, Maryland, and took a job with Barrett Services Employment Agency (Barrett Services). In October 1996, Atueyi met Johnson and Ibezim, two fellow Nigerians, at Barrett Services, where Johnson and Ibezim also worked.

In November 1996, Atueyi resumed his activities in the heroin importation business. Also in November 1996, Johnson and Ibezim went to work for Atueyi as drug couriers. Around Thanksgiving 1996, Atueyi and Johnson drove from Baltimore to New York City and acquired heroin. The day after Atueyi and Johnson returned to Baltimore, Johnson introduced Atueyi to Arawole at a store in Washington, D.C. Johnson referred to Arawole as his "D.C. connection." At the meeting, Atueyi discussed the prospect of selling heroin to Arawole, but no deals were arranged because Arawole was unwilling to pay $12,000 per hundred grams of heroin.

In December 1996, Atueyi met "Stanley," a Drug Enforcement Administration (DEA) special agent, who was working in an undercover capacity and represented himself as a "big time drug dealer that had access to huge quantities of drugs." Over time, Atueyi told Stanley "everything about [himself]," including that he had sent Johnson and Ibezim to Detroit, Michigan, and that he had heroin contacts in Detroit, New York City, and Chicago, Illinois, and a potential heroin contact in Washington, D.C.

3

In January 1997, Johnson and Ibezim traveled to New York to pick up heroin from a drug courier. After acquiring the heroin, Johnson and Ibezim traveled with the heroin to Detroit, where they sold the heroin to a drug dealer for an unknown sum of money. After the deal was consummated, Johnson and Ibezim returned to Baltimore and gave the proceeds of the sale to Atueyi.

In March 1997, Atueyi arranged a similar transaction for Johnson and Ibezim to complete. This time, while they were attempting to return to Baltimore from Detroit, Johnson and Ibezim were stopped by police in Detroit. The police seized approximately $83,000 in cash from Johnson and Ibezim, but neither Johnson nor Ibezim was arrested.

Following the March 1997 seizure, Johnson told Atueyi that he did not wish to participate in Atueyi's heroin business any longer unless he received 100 grams of heroin for each trip. When Atueyi told Johnson this was not possible, Johnson ceased making trips on behalf of Atueyi, but did remain in contact with Atueyi. Unlike Johnson, Ibezim made three additional trips on behalf of Atueyi following the March 1997 seizure, one in May 1997, the other in June 1997, and the other in either late June or early July 1997.

On July 9, 1997, Atueyi was arrested by Stanley and immediately agreed to cooperate with the government. Between July 10 and July 16, 1997, Atueyi participated in six calls which were recorded. In the first call, July 10, 1997, Atueyi called Ibezim. During this call, Atueyi told Ibezim that Stanley was going to provide him (Atueyi) with three kilograms of heroin and that he (Atueyi) would like to sell one kilogram to Arawole, provided Johnson would contact Arawole. Atueyi asked Ibezim to tell Johnson to contact Arawole, and Ibezim agreed. Ibezim informed Atueyi that, based on what Johnson had told him earlier, Johnson's participation would require that Johnson be given one hundred grams of heroin as a commission.

On July 14, 1997, Atueyi called Ibezim again. During this call, Ibezim told Atueyi that Johnson had contacted Arawole, that Johnson said he would always bring "stuff, if stuff is available," that Johnson would direct Atueyi to Arawole, and that Johnson's participation would require that he be given one hundred grams of heroin as a com-

4

mission. Atueyi told Ibezim that he would inform Stanley that Ibezim would pick up some heroin from him (Stanley), and Ibezim replied, "Anytime, I'm ready certainly." Atueyi also told Ibezim to tell Johnson to contact Arawole, and Ibezim responded that he would.

On July 15, 1997, Atueyi called Ibezim two more times. In the first call, Ibezim told Atueyi that he spoke with Johnson, and Johnson said he was "ready" if Atueyi was "ready." Thereafter, Atueyi told Ibezim to tell Johnson to call Arawole and find out if "something [was] possible, right away." In the second call, Atueyi asked Ibezim if Johnson had called, and Ibezim responded in the negative. Atueyi asked Ibezim to go to Johnson's office and ask Johnson to call him at his cellular phone number. Atueyi explained to Ibezim that, if Johnson could arrange a meeting with Arawole in the morning, Stanley could "travel."

Ibezim then went to Johnson's office, and Johnson called Atueyi. In the ensuing conversation, Johnson indicated that he wanted to consummate a deal with Arawole, but before doing that, he first wanted to "talk" with Atueyi about a subject he could not talk about on the phone.

On July 16, 1997, Atueyi called Ibezim and told him that he was leaving for Detroit. Atueyi also told Ibezim to tell Johnson that Stanley wanted to sell one kilogram of heroin to Arawole and that Johnson's commission for the sale would be one hundred grams of heroin. Atueyi told Ibezim to tell Johnson that he (Johnson) should set up a transaction with Arawole, explaining to Ibezim that he was "on [his] knees, . . . kneeling down for [Johnson], [Johnson] should please do this thing for [him]."[1]

_____

[1] Of note, Atueyi's conversation with Ibezim on July 16, 1997 was in Ibo, a Nigerian dialect. The quoted language is the English translation of that conversation. According to Atueyi's uncontradicted testimony at trial, his statement to Ibezim that he was "on [his] knees, . . . kneeling down for [Johnson], [Johnson] should please do this thing for [him]" was a Nigerian figure of speech, which while importing seriousness, did not mean "begging" as we would commonly understand that word. Also of note, there is no evidence in the record that Atueyi's statement to Ibezim was conveyed to Johnson.

5

Thereafter, Atueyi handed the phone over to Stanley so that he could talk to Ibezim. In his conversation with Ibezim, Stanley asked Ibezim if the three of them (Johnson, Ibezim, and Stanley) could meet that evening, and Ibezim responded in the affirmative. Stanley gave Ibezim his pager number for the purpose of contacting him.

That evening, Johnson and Ibezim met with Stanley to discuss the details of a potential sale of heroin to Arawole. During the meeting, Johnson agreed to arrange a meeting with Arawole, but was uncertain whether Arawole would allow Stanley to attend the meeting. Later that evening, Johnson paged Stanley, and Stanley returned the page by placing a call to Johnson. During their conversation, Johnson told Stanley that he had spoken with Arawole and that Arawole said he was ready to meet Stanley the following day.

On July 17, 1997, Johnson and Ibezim led Stanley to a parking lot in Washington, D.C., to meet Arawole. At the meeting, in the presence of Johnson and Ibezim, Arawole informed Stanley that he could only accept Stanley's heroin on the front**2** and that if Stanley wanted to consummate a deal on those terms he should contact Johnson. Arawole provided Stanley his business card and asked Johnson to put his (Johnson's) home address and phone number on the back of the business card, which Johnson did.

After Arawole left the meeting, Johnson, Ibezim, and Stanley discussed Johnson and Ibezim's commission on each kilogram of heroin Stanley furnished to Arawole. It was agreed that Johnson would receive 100 grams of heroin, and Ibezim fifty, for each kilogram of heroin Stanley furnished to Arawole. Johnson and Ibezim then asked Stanley not to discuss this arrangement with Atueyi out of fear that Atueyi would cut them out of future deals.

Following the meeting, Stanley informed Johnson and Ibezim that he would contact them when he got "the heroin ready." Thereafter, Stanley avoided contacting Johnson or Ibezim until July 24, 1997, even though Johnson and Ibezim paged Stanley on numerous occasions. During this time, Stanley was going through the DEA's admin-

_____

**2** "Fronting" is the practice of supplying narcotics on credit.

6

istrative channels to obtain one kilogram of heroin, which he obtained on July 24, 1997.

On July 24, 1997, Stanley called Arawole and, after indicating he was having difficulty contacting Johnson, told Arawole that he wanted to meet him the following day. Stanley asked Arawole how many kilograms of heroin he was interested in, to which Arawole responded "ten." After Stanley indicated that he had one kilogram of heroin, Arawole agreed to meet with Stanley the following day, although the exact time and location of the meeting was not set; instead, Arawole asked Stanley to call him and tell him where to meet.

On the same day, Stanley spoke with Johnson and Ibezim to see if they could meet the following day to consummate a deal with Arawole. During this conversation, Stanley indicated that he had spoken with Arawole and that Arawole indicated he would be ready to consummate a deal. Johnson and Ibezim agreed to meet with Stanley prior to their intended meeting with Arawole.

On July 25, 1997, Johnson and Ibezim met Stanley in Baltimore. At the meeting, Stanley proposed to give Johnson and Ibezim a package containing three kilograms of heroin[3] to be delivered to Arawole, explaining that, because he was not sure how long it would take Arawole to consummate the deal and whether Arawole would be home, he preferred not to attend the meeting. Thereafter, Ibezim asked Stanley if they should call Arawole to see if he wanted Johnson and Ibezim to pick up the package. Stanley then asked Johnson if he wanted to call Arawole, and Johnson responded in the affirmative.

Johnson then attempted to call Arawole, but was unable to reach him. Johnson indicated at that point that he and Ibezim would take the package to Arawole and that Stanley did not have to go if he did not want to go. Johnson then stated that, because they were in the same spot for a lengthy period of time, he wanted to accept the package at a different location. Stanley and Johnson each drove their vehicles a short distance before returning to the original location of their meet-

_____

[3] The package contained one kilogram of authentic heroin and two kilograms of sham substance.

7

ing. At that point, Johnson and Ibezim walked over to Stanley's vehicle, and Stanley handed Ibezim the package containing heroin, which Ibezim accepted. Johnson and Ibezim were then arrested.

Later in the evening, Stanley called Arawole to arrange a meeting. Arawole, unaware of the arrest of Johnson and Ibezim, met Stanley in a parking lot in Prince George's County, Maryland. During this meeting, Arawole agreed to give Stanley the title to one of his vehicles and approximately $3,000 as a show of good faith for the large amount of heroin Stanley was providing to him on the front. Arawole left the meeting and returned a short time later with the title and the money. Arawole gave the title and the money to Stanley and accepted the package containing heroin that was seized after Johnson and Ibezim were arrested. Arawole was then arrested.

On August 5, 1997, Johnson, Ibezim, and Arawole were indicted by a federal grand jury sitting in the District of Maryland on three counts. Count One charged Johnson, Ibezim, and Arawole with conspiracy to possess heroin with the intent to distribute and to distribute heroin in violation of 21 U.S.C. §§ 841(a)(1) and 846. Count Two charged Johnson and Ibezim with possession of heroin with the intent to distribute and aiding and abetting the same in violation of 18 U.S.C. § 2 and 21 U.S.C. § 841(a)(1). Count Three charged Arawole with possession of heroin with the intent to distribute in violation of 21 U.S.C. § 841(a)(1). Following a jury trial, Johnson and Ibezim were convicted on Counts One and Two, and Arawole was convicted on Counts One and Three. The district court sentenced Arawole to 151 months' imprisonment, and Johnson and Ibezim each received a sentence of imprisonment of 121 months. Johnson, Ibezim, and Arawole each noted a timely appeal.

II

Prior to trial and throughout the proceedings, Arawole requested that his case be severed from Johnson and Ibezim's case. These requests were denied by the district court. Arawole argues that the district court abused its discretion in refusing to sever his case from Johnson and Ibezim's case. Specifically, Arawole contends that he suffered prejudice because the evidence against him was minimal when compared to the case developed by the government against

8

Johnson and Ibezim, and because the majority of the prejudicial testimony did not apply to him, especially the evidence concerning the March 1997 seizure, which the district court admitted under Federal Rule of Evidence 404(b).

Rule 8(b) of the Federal Rules of Criminal Procedure provides that "[t]wo or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." In such cases, the federal system prefers joint trials because they promote efficiency and "serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." Zafiro v. United States, 506 U.S. 534, 537 (1993) (citation and internal quotes omitted). We adhere to the general rule that defendants charged in the same conspiracy should be tried together. See United States v. Reavis, 48 F.3d 763, 767 (4th Cir. 1995).

Rule 14 of the Federal Rules of Criminal Procedure, however, provides that joinder, even when appropriate under Rule 8(b), may be so prejudicial that the defendants should be tried separately. The mere showing of prejudice is not enough to require severance. See Zafiro, 506 U.S. at 538-39. Rather, the relief, if any, for any potential prejudice resulting from a joint trial is left to the district court's sound discretion. See id. Thus, we review a district court's refusal to grant a motion for severance for an abuse of discretion. See Reavis, 48 F.3d at 767. A district court abuses its discretion "only if there [was] a serious risk that a joint trial would [have] compromise[d] a specific trial right of one of the defendants, or prevent[ed] the jury from making a reliable judgment about guilt or innocence." Zafiro, 506 U.S. at 539.

We find no abuse of discretion in the district court's refusal to sever Arawole's case from that of the other defendants. First, the evidence against Arawole was strong. See United States v. Hayden, 85 F.3d 153, 160-61 (4th Cir. 1996) (district court did not abuse its discretion in refusing to grant motion for severance where evidence against the defendant was strong and the case was not complex). On July 17, 1997, Johnson and Ibezim led Stanley to a parking lot in Washington, D.C., to meet Arawole. At the meeting, in the presence of Johnson and Ibezim, Arawole informed Stanley that he could only accept Stanley's heroin on the front and that if Stanley wanted to con-

9

summate a deal on those terms he should contact Johnson. After Arawole left the meeting, Johnson, Ibezim, and Stanley discussed Johnson and Ibezim's commission on each kilogram of heroin Stanley furnished to Arawole. On July 24, 1997, Arawole agreed to meet with Stanley the following day. On the same day, Stanley spoke with Johnson and Ibezim. During this conversation, Stanley indicated that he had spoken with Arawole and that Arawole indicated he would be ready to consummate a deal. Johnson and Ibezim agreed to meet with Stanley prior to their intended meeting with Arawole. On July 25, 1997, Johnson and Ibezim met Stanley in Baltimore. At the meeting, Johnson and Ibezim accepted the package containing heroin for the purpose of delivering it to Arawole. Later in the evening, Stanley met Arawole in a parking lot in Prince George's County, Maryland. During this meeting, Arawole agreed to give Stanley the title to one of his vehicles and approximately $3,000 as a show of good faith for the large amount of heroin Stanley was providing to him on the front. Arawole left the meeting and returned a short time later with the title and the money. Arawole gave the title and the money to Stanley and accepted the package. This evidence conclusively establishes that Arawole knowingly and willingly conspired with Johnson and Ibezim to possess heroin with the intent to distribute and to distribute heroin.

With respect to Arawole's possession of heroin, the government's evidence conclusively established that Arawole willfully accepted the package knowing that it contained heroin. Arawole met Stanley in a parking lot in Prince George's County, Maryland. During this meeting, Arawole accepted the package knowing that it contained heroin.

Second, the case was not so complex that the jury could not separate the evidence as to each defendant. See id. at 161. This case involved a straightforward reverse sting operation involving only five participants.

Third, the district court gave a cautionary instruction to the jury that the use of the March 1997 seizure and other acts engaged in by Johnson and Ibezim not charged in the indictment were "not [to] be used . . . in any way with regard to Mr. Arawole." This cautionary instruction eliminated any risk of prejudice to Arawole. See id. at 160 ("Often, less dramatic measures, such as limiting instructions, act to cure any risk of prejudice.").

10

In summary, the jury was free to make an individual determination as to Arawole's guilt. Thus, any alleged "spill-over" effect from the Rule 404(b) evidence admitted against Johnson and Ibezim did not prejudice Arawole. Accordingly, the district court did not abuse its discretion in refusing to sever Arawole's case from that of the other defendants.

III

Because Atueyi testified pursuant to a favorable plea agreement, the appellants contend that the government's use of his testimony violated 18 U.S.C. § 201(c)(2) and, therefore, Atueyi's testimony should have been suppressed.**4** The appellants' contention is without merit.

Appellants never objected to Atueyi's testimony on the basis that its use violated § 201(c)(2). Therefore, we review this alleged error under the plain error standard. See Fed. R. Crim. P. 52(b). Among other things, the plain error standard requires proof that there is an error that is clear and obvious under existing law. See United States v. Castner, 50 F.3d 1267, 1277-78 (4th Cir. 1995); see also United States v. Olano, 507 U.S. 725, 734 (1993).

The Appellants rely upon a panel decision of the Tenth Circuit, United States v. Singleton, 144 F.3d 1343 (10th Cir. 1998), where the court held that a plea agreement offering a witness leniency in exchange for testimony violated § 201(c)(2). See id. at 1344-59. The panel's holding in Singleton was recently rejected by the Tenth Circuit en banc, see United States v. Singleton, 165 F.3d 1297, 1299-1302 (10th Cir. 1999) (en banc), and the panel's holding in Singleton has been rejected by every circuit court to address the issue. See, e.g., United States v. Haese, 162 F.3d 359, 366-68 (5th Cir. 1998); United States v. Ware, 161 F.3d 414, 418-25 (6th Cir. 1998). Thus, assuming there was error, it was not plain and obvious under existing law because no Supreme Court or circuit court opinion stands to support

_____

**4** Section 201(c)(2) provides in relevant part: "[Whoever] directly or indirectly, gives, offers, or promises anything of value to any person, for or because of the testimony under oath or affirmation given or to be given by such person as a witness [in a federal trial shall be fined under this title or imprisoned for not more than two years, or both]."

11

the appellants' position. Therefore, the appellants are entitled to no relief on this claim.

IV

Johnson and Ibezim contend that the district court erred in refusing to instruct the jury on the law of entrapment. We disagree.

A valid entrapment defense contains two elements: (1) government inducement and (2) lack of predisposition to commit the crime on the defendant's part. See United States v. Sligh, 142 F.3d 761, 762 (4th Cir. 1998); United States v. Singh, 54 F.3d 1182, 1189 (4th Cir. 1995). Entrapment is an affirmative defense, and the defendant has the initial burden to "`produce more than a scintilla of evidence that the government induced him to commit the charged offense,' . . . before the burden shifts to the government to prove beyond a reasonable doubt that the defendant was predisposed to commit the crime." Sligh, 142 F.3d at 762 (quoting United States v. Daniel, 3 F.3d 775, 778 (4th Cir. 1993)). A defendant is not entitled to an entrapment jury instruction unless he can meet his initial burden of producing some evidence of government inducement. See Sligh, 142 F.3d at 762-63.

"`Inducement' is a term of art: it involves elements of governmental overreaching and conduct sufficiently excessive to implant a criminal design in the mind of an otherwise innocent party. . . . Solicitation, by contrast, is the provision of an opportunity to commit a criminal act." Daniel, 3 F.3d at 778. A showing of government solicitation is insufficient to warrant an entrapment instruction "because solicitation by itself is not the kind of conduct that would persuade an otherwise innocent person to commit a crime, or that would be so inducive to a reasonably firm person as likely to displace mens rea." United States v. Osborne, 935 F.2d 32, 38 (4th Cir. 1991) (citation and internal quotes omitted). We review the district court's refusal to give an entrapment instruction de novo. See Singh, 54 F.3d at 1189.

We are convinced that Johnson and Ibezim failed to meet their burden of producing some evidence of inducement. The evidence in the record demonstrates that the government did not implant a criminal design in otherwise innocent parties. Both Johnson and Ibezim

12

worked for Atueyi as drug couriers beginning in November 1996, and Ibezim's participation in Atueyi's heroin business continued unabated through the time he received the package containing heroin from Stanley. Although Johnson ceased making trips for Atueyi after the March 1997 seizure, he did so merely because Atueyi would not give him 100 grams of heroin per trip.

The circumstances leading up to Johnson and Ibezim's acceptance of the package demonstrate that there was no inducement in this case. Between July 10, 1997, and July 16, 1997, Atueyi participated in six calls which were recorded. In the first call, July 10, 1997, Atueyi called Ibezim and told Ibezim that Stanley was going to provide him (Atueyi) with three kilograms of heroin and that he would like to sell one kilogram to Arawole, provided Johnson would contact Arawole. Ibezim expressed no reluctance in engaging in such a transaction. Rather, Ibezim agreed to tell Johnson to contact Arawole.

In the next call, July 14, 1997, Ibezim told Atueyi that Johnson had contacted Arawole, that Johnson said he would always bring "stuff, if stuff is available," that Johnson would direct Atueyi to Arawole, and that Johnson's participation would require that he be given one hundred grams of heroin as a commission. Atueyi told Ibezim that he would inform Stanley that Ibezim would pick up some heroin from him (Stanley), and Ibezim replied, "Anytime, I'm ready certainly." Atueyi also told Ibezim to tell Johnson to contact Arawole, and Ibezim responded that he would. At this point, there is no suggestion of reluctance on the part of Johnson or Ibezim to engage in a heroin transaction with Arawole.

The following day, July 15, 1997, Atueyi called Ibezim twice. In the first call, Ibezim told Atueyi that he spoke with Johnson, and Johnson said he was "ready" if Atueyi was"ready." Thereafter, Atueyi told Ibezim to tell Johnson to call Arawole and find out if "something [was] possible, right away." In the second call, Atueyi asked Ibezim if Johnson had called, and Ibezim responded in the negative. Atueyi asked Ibezim to go to Johnson's office and ask Johnson to call him at his cellular phone number. Atueyi explained to Ibezim that, if Johnson could arrange a meeting with Arawole in the morning, Stanley could "travel." Again, during these conversations, Ibezim

13

expressed no reluctance to engaging in a heroin transaction with Johnson and Arawole.

Ibezim then went to Johnson's office, and Johnson called Atueyi. In the ensuing conversation, Johnson indicated that he wanted to consummate a deal with Arawole, but before doing that, he first wanted to "talk" with Atueyi about a subject he could not discuss over the phone. At this point, Johnson's reluctance to engage in a heroin transaction with Arawole and Ibezim is not based on his desire not to engage in heroin trafficking, but rather on the need to "talk" to Atueyi about a subject he could not talk about over the phone.

On July 16, 1997, Atueyi told Ibezim to tell Johnson that Stanley wanted to sell one kilogram of heroin to Arawole and that Johnson's commission for the sale would be one hundred grams of heroin. Atueyi told Ibezim to tell Johnson that he (Johnson) should set up a transaction with Arawole, explaining to Ibezim that he was "on [his] knees, . . . kneeling down for [Johnson],[Johnson] should please do this thing for [him]."

Thereafter, Atueyi, who had told Ibezim falsely that he was headed to Detroit, handed the phone over to Stanley so that he could talk to Ibezim. In his conversation with Ibezim, Stanley asked Ibezim if the three of them (Johnson, Ibezim, and Stanley) could meet that evening, and Ibezim responded in the affirmative. Stanley gave Ibezim his pager number for the purpose of contacting him. During this conversation, Ibezim expressed no reluctance to engage in a heroin transaction with Johnson and Arawole.

That evening, Johnson and Ibezim met with Stanley to discuss the details of a potential sale of heroin to Arawole. During the meeting, Johnson agreed to arrange a meeting with Arawole. Later that evening, Johnson spoke with Stanley by telephone and told him that he had spoken with Arawole and that Arawole said he was ready to meet Stanley the following day. During this meeting, neither Johnson nor Ibezim expressed any reluctance to engaging in a heroin transaction with Arawole.

Obviously, at this point, both Johnson and Ibezim were free to terminate their contact with Stanley. Instead, on July 17, 1997, Johnson

14

and Ibezim led Stanley to a parking lot in Washington, D.C., to meet Arawole. At the meeting, in the presence of Johnson and Ibezim, Arawole informed Stanley that he could only accept Stanley's heroin on the front and that if Stanley wanted to consummate a deal on those terms he should contact Johnson. Arawole provided Stanley his business card and asked Johnson to put his (Johnson's) home address and phone number on the back of the business card, which Johnson did. After Arawole left the meeting, Johnson, Ibezim, and Stanley discussed Johnson and Ibezim's commission on each kilogram of heroin Stanley furnished to Arawole. It was agreed that Johnson would receive 100 grams of heroin, and Ibezim fifty, for each kilogram of heroin Stanley furnished to Arawole. Johnson and Ibezim then asked Stanley not to discuss this arrangement with Atueyi out of fear that Atueyi would cut them out of future deals. Following the meeting, Stanley informed Johnson and Ibezim that he would contact them when he got "the heroin ready."

While Stanley was going through the DEA's administrative channels to acquire the heroin, Johnson and Ibezim expressed no reluctance to engage in a transaction with Arawole. Rather, Johnson and Ibezim paged Stanley on numerous occasions.

On July 24, 1997, Stanley spoke with Johnson and Ibezim to see if they could meet the following day to consummate a deal with Arawole. During this conversation, Stanley indicated that he had spoken with Arawole and that Arawole indicated he would be ready to consummate a deal. Without reluctance, Johnson and Ibezim agreed to meet with Stanley prior to their intended meeting with Arawole.

On July 25, 1997, Johnson and Ibezim met Stanley in Baltimore. At the meeting, Stanley proposed to give Johnson and Ibezim the package containing heroin to be delivered to Arawole. Thereafter, because Stanley did not want to participate in the delivery to Arawole, Johnson attempted to call Arawole to see if Arawole wanted him (Johnson) and Ibezim to pick up the package containing heroin; but, Johnson was unable to reach Arawole. Johnson indicated at that point that he and Ibezim would take the package containing heroin to Arawole. Johnson then stated that, because they were in the same spot for a lengthy period of time, he wanted to accept the package at a different location. Stanley and Johnson each drove their vehicles a short

15

distance before returning to the original location of their meeting. At that point, Johnson and Ibezim walked over to Stanley's vehicle, and Stanley handed Ibezim the package containing heroin, which Ibezim accepted. During this encounter, Johnson and Ibezim expressed no reluctance to engage in a heroin transaction with Arawole, although Johnson expressed a reluctance to take the package under circumstances that he perceived would appear suspicious.

The evidence in this case reveals that Johnson and Ibezim were provided an opportunity to engage in a heroin transaction with Arawole and responded in a manner consistent with a desire to see that transaction come to fruition. Ibezim expressed no reluctance. Johnson expressed some, but his reluctance pertained to his desired commission and his unwillingness to accept the package under circumstances that he perceived would appear suspicious. And although Atueyi was persistent in getting Johnson and Ibezim to arrange a transaction with Arawole, his actions were in no way "sufficiently excessive to implant a criminal design in the mind of an otherwise innocent party." Daniel, 3 F.3d at 778.

Johnson and Ibezim make much of the fact that on July 16, 1997, Atueyi told Ibezim to tell Johnson that he (Johnson) should set up a transaction with Arawole, explaining to Ibezim that he was "on [his] knees, . . . kneeling down for [Johnson],[Johnson] should please do this thing for [him]." Johnson and Ibezim suggest that Atueyi was "begging" Johnson and Ibezim and that this begging, coupled with the other evidence summarized above, warranted an entrapment instruction. We disagree. At the time Atueyi made this statement to Ibezim, Johnson and Ibezim had already agreed to engage in a heroin transaction with Arawole, the only remaining details were where and when, and Johnson's commission. In addition, according to Atueyi's uncontradicted testimony at trial, his statement to Ibezim that he was "on [his] knees, . . . kneeling down for [Johnson], [Johnson] should please do this thing for [him]" was a Nigerian figure of speech, which while importing seriousness, did not mean "begging" as we would commonly understand that word. Finally, there is no evidence in the record demonstrating that Atueyi's statement to Ibezim was conveyed to Johnson. Thus, Atueyi's statement to Ibezim, when viewed in the context of when it was made and what Atueyi meant by the statement,

16

played only a marginal role, if any, in getting Johnson and Ibezim to meet with Stanley.

In summary, the district court correctly refused Johnson and Ibezim's request for an entrapment instruction.

V

The appellants argue that the district court was constitutionally required to give an instruction defining reasonable doubt after the appellants requested such an instruction. This argument has no merit.

The Supreme Court has held that trial courts are under no constitutional obligation to define reasonable doubt, so long as the trial court instructs the jury that the prosecutor must prove the defendant's guilt beyond a reasonable doubt. See Victor v. Nebraska, 511 U.S. 1, 5 (1994). In this case, there was no constitutional violation because the district court instructed the jury that the government had the burden of proving each element of its case beyond a reasonable doubt.

In any event, we have cautioned district courts against defining reasonable doubt. See, e.g., United States v. Oriakhi, 57 F.3d 1290, 1300 (4th Cir. 1995). A district court is under no obligation to instruct a jury on reasonable doubt simply because a party requests that instruction. See United States v. Reives, 15 F.3d 42, 44 (4th Cir. 1994) ("We have never found a refusal of a party's request for a clarifying instruction to be error."). The only exception that we have recognized to the general rule against defining reasonable doubt is in the context of responding to a jury's specific request for a definition. See id. at 45-46. In this case, the district court adhered to our strong policy against giving a reasonable doubt instruction. Accordingly, the district court did not err in refusing to define reasonable doubt.

VI

Finally, the appellants argue that the district court erred when it denied their post-trial motions for a new trial. According to the appellants, their evidence of juror misconduct warranted a new trial. We disagree.

17

The jury returned a guilty verdict against the appellants on each count in which they were charged. The unanimity of the verdict was confirmed through a jury poll in which each juror separately affirmed that the verdict was that of the particular juror. However, despite her affirmances during the jury poll, Juror Number Twelve wrote a letter to the district court wherein she expressed misgivings about the verdict. Juror Number Twelve wrote in relevant part:

> I did have doubts and reasonable doubts in this case. I could not come to a decision as did my fellow jurors did.
>
> I felt that I was pressured to make my decision. I was the only black juror on the panel. Even though I should have spoken out earlier, but (sic) I was a little reluctant. I did agree with the other jurors but I did not want too (sic). I wanted a not guilty verdict. . . . To be truthful with you I was hesitate (sic) to speak out being the only black juror. I didn't want them to think just because the defendants are black is why I wanted a not guilty verdict. That is not the case. . . .
>
> I just want you to know that juror 12 . . . did not wanted (sic) to agree with the other jurors.
>
> They had pointed [to] some evidence that changed my decision (with hesitation).
>
> But in reality I didn't want to convict them.
>
> I wanted a not guilty verdict. . . .
>
> I've had doubts and I do still have them in this particular case.
>
> It's probably too late to change anything but I wanted you to know this from the bottom of my soul.

Each appellant filed a motion for new trial based on, among other things, the letter written by Juror Number Twelve. According to the

18

appellants, Juror Number Twelve engaged in juror misconduct because she voted to convict them because they were of African-American descent in violation of their constitutional rights. The district court denied the motions.

We review the denial of a motion for new trial based on alleged juror misconduct for an abuse of discretion. See United States v. Roach, 164 F.3d 403, 413 (8th Cir. 1998). The district court held that Federal Rule of Evidence 606(b) prohibited it from considering Juror Number Twelve's letter in connection with the appellants' allegation that Juror Number Twelve engaged in juror misconduct because she voted to convict the appellants because they were of African-American descent in violation of their constitutional rights.

Rule 606(b) of the Federal Rules of Evidence governs the impeachment of jury verdicts. Rule 606(b) states, in pertinent part:

> Upon an inquiry into the validity of a verdict . . ., a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict . . . or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

In Tanner v. United States, 483 U.S. 107 (1987), after acknowledging that "[b]y the beginning of this century, if not earlier, the near-universal and firmly established common-law rule in the United States flatly prohibited the admission of juror testimony to impeach a jury verdict," id. at 117, the Court observed that "Federal Rule of Evidence 606(b) is grounded in the common-law rule against admission of jury testimony to impeach a verdict and the exception for juror testimony relating to extraneous influences." Id. at 121. "The purpose of Rule 606(b) is to promote finality of verdicts, encourage free delib-

19

erations among jurors, and maintain the integrity of the jury as a judicial decision-making body." Wilson v. Vermont Castings, Inc., 170 F.3d 391, 394 (3d Cir. 1999).

Thus, Rule 606(b), which codifies the common law rule against the use of juror testimony to impeach a verdict, only allows jurors to testify about "extraneous prejudicial information" or "outside influence . . . improperly brought to bear upon any juror." Fed. R. Evid. 606(b); see also Tanner, 483 U.S. at 121 (evidence that jurors slept and consumed drugs and alcohol in the course of trial and deliberations inadmissible under Rule 606(b) to impeach verdict). Generally, "extraneous prejudicial information" means information about the specific case that the jury has acquired outside of the judicial process, see Hard v. Burlington Northern R.R., 870 F.2d 1454, 1460-62 (9th Cir. 1989), and an "outside influence" refers to a factor originating outside of normal courtroom proceedings which influences jury deliberations, such as a statement made by a bailiff to the jury or a threat against a juror, see United States v. Jones, 132 F.3d 232, 245 (5th Cir. 1998). See also United States v. Bassler, 651 F.2d 600, 602 (8th Cir. 1981) ("Extrinsic or extraneous influences include publicity received and discussed in the jury room, matters considered by the jury but not admitted into evidence, and communications or other contact between jurors and outside persons.").

None of the information contained in Juror Number Twelve's letter relates to information about the specific case that the jury acquired outside of the judicial process, see Hard, 870 F.2d at 1460-62, or refers to a factor originating outside of normal courtroom proceedings which influenced the jury's deliberations, see Jones, 132 F.3d at 245. Rather, the information contained in Juror Number Twelve's letter, at best, suggests that she experienced internal coercion when she voted to convict. Under such circumstances, the district court properly declined to consider the letter when it ruled on each motion for new trial filed by the appellants. See Roach, 164 F.3d at 412-13 (court rejected defendants' argument that they were entitled to new trial based upon juror misconduct where juror submitted post-trial affidavit stating that: (1) she had been unwilling to convict the defendants but that the other jurors had pressured her into changing her vote; (2) one juror told her the judge would incarcerate her if she failed to do her civic duty and vote to convict; (3) there were racial overtones in the

20

jury room; (4) she was one of two Native American jurors, and for a time she was the only holdout against convicting the three Native American defendants; (5) other jurors made references to her race and one said "[i]t was ten white people versus one Indian"; and (6) she was a diabetic, and other jurors told her that she could get something to eat with them after a verdict was returned); United States v. Brito, 136 F.3d 397, 414 (5th Cir.) (evidence of internal coercion inadmissible under Rule 606(b)), cert. denied, 119 S. Ct. 159 (1998).[5]

## VII

For the reasons stated herein, the judgments of the district court are affirmed.

AFFIRMED

_____

[5] To the extent that the appellants assert a McDonough claim, we reject this argument because the appellants have failed to demonstrate that Juror Number Twelve failed to answer honestly a material question on voir dire. See McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 556 (1984). In addition, to the extent that the appellants assert a general Sixth Amendment claim of juror bias, see id. at 556-57 (Blackmun, J., concurring), we reject this claim because there is no evidence of actual or implied bias in this case.